THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES A. BEARD, Defendant-Appellant.

Fourth District   No. 4—93—1049

Opinion filed June 30, 1995.

Daniel D. Yuhas and Khalil Cox, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and James L. Overholt, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in the circuit court of Macon County, defendant James Beard was convicted of first degree murder (720 ILCS 5/9—1(a)(3) (West 1992)) and concealment of a homicidal death (720 ILCS 5/9—3.1(a) (West 1992)). He was sentenced to a term of natural life in prison. He now appeals, contending that (1) the trial court erred in admitting evidence of semen found at the scene of the crime where the semen was not connected to him; (2) reversible error occurred in the admission of a witness' prior consistent statement; and (3) his sentence of natural life in prison was improper where he was not proved guilty beyond a reasonable doubt of committing murder in the course of an attempt (aggravated criminal sexual assault) (720 ILCS 5/8—4, 12—14 (West 1992)). We disagree and affirm.

Defendant and his wife, Donna Beard (Donna), were charged with five counts of first degree murder in the April 10, 1993, death of J.P., a 71-year-old woman. They were also charged with concealing J.P.'s death. Count V of the information charged that defendant and Donna killed J.P. in the course of attempting to commit aggravated criminal sexual assault. Donna entered into a plea agreement with the State whereby the murder counts were dropped, she pleaded guilty to concealment of a homicidal death, and she agreed to testify at defendant's trial.

At the trial, James Williams, J.P.'s boyfriend at the time of her death, testified that he and J.P. were unable to have sexual intercourse because of physical problems he was experiencing. The last time they had tried was 12 years before. He saw J.P. the day of her death and her clothes were clean.

Craig Gessford, deputy sheriff for Macon County, testified that he found J.P.'s body in a ditch by the side of a road. She was nude, and there was a pile of clothing next to her body.

Tommie Martin, crime scene technician with the Illinois State Police, testified regarding evidence he collected at the crime scene. There were no obvious signs of trauma to J.P.'s body. He identified the clothing found beside the body, noting that the blue jeans and

underpants were soiled with fecal material, but no such matter was found on the body. He attended the autopsy on J.P.'s body. Certain evidence was collected from the body to determine whether a sexual assault had taken place. Martin also assisted in the execution of a search warrant of defendant's house and vehicle, where several items were recovered.

Dr. Travis Hindman, a pathologist at Memorial Medical Center in Springfield, testified that he performed an autopsy on J.P.'s body. J.P. was a very small woman, weighing 90 pounds and standing five feet tall. Her postmortem blood-alcohol level was 0.164. She had a small hemorrhage in the soft tissues just beneath the scalp at the back of her head. There was also a small superficial mark on one side of her neck, the cause of which he was unable to determine. He was unable to identify a cause of death. He could not, however, rule out compression as a cause. It would be possible to choke a person of J.P.'s size without leaving visible marks. ·

Shelly Patterson, a bartender at the Belvidere Inn (Belvidere), testified that she served drinks to J.P. shortly after 12 p.m. on April 10, 1993. She stayed at the Belvidere three or four hours, during which time she consumed four alcoholic drinks.

Fred Roof testified that he had drinks with J.P. at the Belvidere and then walked with her to another tavern, Mr. Lucky's. He sat with her for about ·1¹/₂ hours and, when he came out of the restroom, J.P. had left.

Robin Bodine, an employee of Mr. Lucky's, testified that J.P. usually patronized the tavern once or twice a week. She first noticed J.P. in the tavern on April 10, 1993, about 3 p.m. J.P. left the tavern about 5:45 p.m. with defendant and Donna, who were taking her home.

Charles Puckett, former assistant manager of Mr. Lucky's, testified that J.P. left the tavern on April 10, 1993, about 6 p.m. Defendant purchased some beer and left with J.P. and another woman.

Nelda Hubbard, a regular customer at Mr. Lucky's, testified that she saw J.P. there on April 10, 1993, about 5:30 p.m. She was talking to Donna, and then they left with defendant. Hubbard was in the tavern about 8:30 p.m. that day and again saw defendant and Donna there.

Donna testified that she has been married to defendant for three years and that she and defendant are both 50 years of age. She and defendant sometimes engaged in sex with others they met in bars. On April 10, 1993, defendant began drinking beer at 8 a.m. He had nothing to eat that day. She is not a heavy drinker. They went to Mr. Lucky's about 10 a.m., where defendant had more beer. They left for

a while, returning at approximately 5:30 p.m. She saw J.P. there, and it appeared she was drinking quite a lot. J.P. had been to their house once in 1992. Defendant then stated he was planning to have sex with J.P. Nothing took place, however, even though J.P. spent the night at their house. On April 10, 1993, defendant told her to ask J.P. if she wanted a ride home. J.P. agreed to allow defendant and Donna to take her home. Defendant purchased some beer before they left. Donna was not intoxicated, but defendant was. J.P. was also intoxicated. Defendant drove the car to their house, and Donna helped J.P. inside. She sat on the living room couch and began to complain that her back hurt. Defendant asked to take a look at her back, and J.P. allowed him to take off her sweater and shirt. Defendant also took off J.P.'s bra. Donna could see that J.P. had some sores on her back. Defendant asked for some baby oil and peroxide, and Donna went to the bathroom to get it. Defendant applied the medicine to J.P.'s back. Defendant then asked Donna to take J.P.'s jeans off. Although she did not want to, Donna complied with this request. Defendant held J.P.'s arms while Donna took her pants off. J.P. was fighting them. After Donna saw that J.P. had "messed" her pants, she was going to give her a bath. J.P. partially dressed herself and said she was going home. At this point, defendant was sitting in a chair in the living room. J.P. then said that she hated both of them, she was going to get them for rape, and her sons were going to beat them up. Defendant said, "You know what I have to do." He went over to the couch and began wrestling with J.P., choking her with his hands. At defendant's request, Donna checked for a pulse and felt a very faint one. She told defendant that J.P. was barely breathing. Defendant went back to the couch and choked her again. A few minutes later, Donna checked J.P.'s pulse and said she was dead. At some point prior to killing J.P., defendant had taken off all of J.P.'s clothes. Sometime later, at defendant's request, Donna tried to manipulate his penis so that he could have sex with J.P.'s body. He got on top of J.P. and remained there for about 10 minutes, acting as if he were having sex. Donna did not think defendant had an erection, and she did not know whether he ejaculated.

When Donna saw that J.P. had "messed" herself, she cleaned her off with a rag. This was prior to defendant's having sex with the body. They dragged J.P. off the couch and placed her in the backseat of their car. During this process, something struck J.P.'s head. Donna put her clothes in a paper bag. They stopped on a road, dumping the body in a ditch and the clothes out of the sack. They went back to Mr. Lucky's, picked up a man, and went back to their house where they all had sex later that night. Defendant told her to tell police

that when she came out of the bathroom, J.P. was walking down the street.

On cross-examination, Donna testified that she was interviewed by two police officers the day after J.P.'s death. She told them all that happened was that defendant made a pass at J.P. and that J.P. left their house after about 30 minutes. Defense counsel questioned Donna about details of this interview, bringing out certain discrepancies between the statement and her testimony. Donna admitted she had at first told the officers she and defendant stayed home after J.P. left, then changed her statement to say that they had gone out again that night. She also told the officers she and defendant had given J.P. a ride to their house so that she could use the telephone. In the course of questioning her about her statement, defense counsel read several portions of the interview. Donna denied arguing with J.P. and pushing her down into the couch, thereby causing her to strike the back of her head. She stated that defendant told her he did not ejaculate.

On redirect examination, Donna agreed that defense counsel had asked her about approximately half the statements she had given police. The prosecutor then asked whether it was true that she told police defendant had sex with J.P.'s body, to which Donna replied, "Yes it is." At this point defense counsel objected, on the basis that this was a prior consistent statement and inadmissible. The trial court overruled the objection, stating that defense counsel had questioned Donna in great detail about her statement and that the prosecution could also ask questions.

Roosevelt Mukes testified that he saw defendant and Donna come into Mr. Lucky's about 8:30 p.m. on April 10, 1993. He stayed and drank with the Beards until after midnight. Then they all went to the Beards' house. He was intoxicated and spent the night there, but denied having sex with anyone while there.

Stacie Harms, a forensic scientist for the Illinois State Police, testified that she tested J.P.'s clothes for the presence of semen. It is not possible to tell how long a particular stain has been on an item. The jeans were heavily stained with fecal material. There were stains on the back of the jeans which she tested for the presence of seminal material. She examined a large stain on the back of the jeans near the waistband. The preliminary test was inconclusive, and she could not microscopically detect any sperm cells. She found no seminal material on any other item of J.P.'s clothing. After other testing was completed by another scientist and standards obtained from defendant, she then was able to identify one sperm cell from material extracted from the stain on the back of the jeans. She testified that,

to a reasonable degree of scientific certainty, seminal material was identified in this stain. She found no seminal material in any of the vaginal, oral, and rectal swabs taken from J.P.

On cross-examination, Harms testified that she could not be certain whether defendant was the source of the seminal material found, nor could she determine how old the seminal material was.

Andrew Wist, also a forensic scientist with the Illinois State Police, testified regarding the test he performed on the stain on J.P.'s jeans. The test is an identification test for semen, and it does not give blood type or any identifying characteristics. The result of this test showed the presence of human seminal material in the stain.

Anthony Robinson, an inmate of the Macon County jail, testified that he was incarcerated at the same time as defendant and they talked to each other every day. Over the course of several conversations, defendant told him that he choked J.P. and, when he left the room, she was not dead. He also said he wished he had not done it and that "he got what she came here for." Defendant also said that "she got what she wanted" and that he had instructed his wife to clean J.P. up. Defendant was upset that his wife was talking to the police, and he sent a message for her to be quiet. He said "he had to have a hit put on her to shut her up," and that he would turn things around to make it look as though his wife had killed J.P. and he would walk "scot-free." Another inmate, Timothy Spain, was also present during some of these conversations.

On cross-examination, Robinson testified that he did not want to testify and that he had previously been convicted of residential burglary and felony deceptive practices.

Jonathan Butts, detective for the Macon County sheriff's office, testified that he had a tape-recorded interview with defendant the day after the murder. Defendant was picked up at Mr. Lucky's and had been drinking at the time. The tape of the interview was played for the jury. A transcript of the interview was admitted into evidence but is not contained in the record on appeal.

A stipulation was read to the jury, whereby it was agreed that DNA tests of the stain on J.P.'s jeans were not conclusive as to the presence of human DNA.

Spain testified, on defendant's behalf, that he was incarcerated in the county jail from March through June 1993, where he met Robinson and defendant. He was not present during any of the conversations testified to by Robinson. The only thing he ever heard defendant say about his case was that he did not kill J.P. He admitted he was not with defendant all the time and did not know what he might have said to others.

Defendant testified that it was Donna's idea to talk to J.P. at Mr. Lucky's and that she told him J.P. wanted to go home with them. He then asked J.P. if she would be interested in going to their home and "partying." J.P. agreed, and they left the tavern. When they arrived home, he sat in his chair and J.P. sat on the couch. She started complaining about her back itching and said she had a sore on her back. She took her sweater off and he helped her pull her blouse up. After he looked at the sores, he told Donna to get some baby oil and peroxide. He reached over and touched J.P.'s breast. She told him to stop, and he did. J.P. had "messed" her pants and Donna asked her to take her pants off so she could help J.P. get cleaned up. Defendant got up about that time and went to the bathroom. He could hear Donna and J.P. talking. Donna told J.P. to take off her pants and get into the bathtub. J.P. said she would not go in the bathroom because defendant was there. They continued to argue and, suddenly, there was silence. When he walked out of the bathroom, J.P. was lying on the couch and Donna said she believed she was dead. He was unable to find a pulse. Donna told him that J.P. kicked her in the mouth and that she grabbed J.P. by the neck and pushed her back onto the couch. Defendant and Donna decided to tell the police he had made a pass at J.P. and that she became angry and left. Defendant denied making any attempt to have sex with J.P.'s body. He denied that Donna fondled him in an attempt to cause an erection. They carried J.P.'s body to their car, then dumped it and her clothes in a roadside ditch.

On cross-examination, defendant testified that prior to midafternoon on April 10, 1993, he drank eight or nine beers. He had eaten only a sandwich prior to going to his former boss' house around 1 or 2 p.m. He arrived at Mr. Lucky's about 5 p.m. He consumed about three beers in $1^1/_2$ hours, then went home with Donna and J.P. He had four beers while at the house. He wanted to have sex with J.P. He pinched her breast to see if she would be willing, and she was not. He denied that he did not think much of women, but admitted to calling them "hair, hide and a hole" in his taped interview with police. He claimed he was referring only to prostitutes, not to J.P. or women in general. He was rather intoxicated when he talked to the police. After he finished treating the sores on J.P.'s back, he sat down in his chair. J.P. was talking to Donna, and he was listening. Donna said J.P. had "messed" her pants, a fact which he had not noticed. He said he had to go to the bathroom and that was when Donna attempted to get J.P. to go to the bathroom to get cleaned up. He could hear the conversation between J.P. and Donna when it got loud. Donna said, "You're going to take your pants off damn it. I'm going

to get you cleaned up." She then yelled, "You kicked me in the mouth." J.P. said she would kick her again if Donna came near her. He heard Donna say, "I'm going to help you." Then, there was silence. He stayed in the bathroom for another five minutes. He saw J.P. lying back, completely naked, on the couch, as if she were asleep or unconscious. Donna then told him what had happened. The story he made up about J.P.'s leaving was to protect Donna, not himself.

At the conclusion of the trial, the jury found defendant guilty of first degree murder while committing a forcible felony and concealing a homicidal death. The trial court denied his post-trial motion.

On appeal, defendant first argues that the trial court erred in allowing evidence of semen on J.P.'s clothing, where that semen was not connected to defendant. He also argues the error was compounded by the prosecutor's emphasis on this evidence in his closing argument, where he referred several times to the importance of the semen stain.

■ The admission of evidence is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there has been an abuse of discretion. (*People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702.) Contrary to defendant's argument, evidence of the semen was both relevant and admissible. "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768, 769.) Evidence of the semen was relevant because it tended to show defendant's intent to have sexual contact with J.P., a fact which defendant denied. There was also sufficient connection between the semen and defendant to support its admissibility in evidence. The connection need not be established through scientific means, as defendant suggests. Rather, circumstantial evidence in the record provides the requisite connection. (See *People v. Givens* (1985), 135 Ill. App. 3d 810, 819, 482 N.E.2d 211, 217.) Defendant's wife testified that she manipulated defendant's genitals, at his request, so that he would be in a condition to have sex with J.P.'s body. Donna testified that defendant then got on top of J.P. and simulated sex for about 10 minutes. From this testimony, the jury could have inferred that the semen on J.P.'s jeans came from defendant.

■ Defendant argues that the prosecutor's closing argument was improper and prejudicial because of references to the semen. The scope of closing arguments lies within the discretion of the trial court. (*People v. Johnson* (1992), 239 Ill. App. 3d 1064, 1070, 608 N.E.2d 36, 41, *appeal denied* (1993), 151 Ill. 2d 571, 616 N.E.2d 341.) Since evidence of the semen was properly admitted, the prosecutor's

reference in his closing argument was not improper. A prosecutor is entitled to argue the evidence and reasonable inferences therefrom. *People v. Hicks* (1981), 101 Ill. App. 3d 238, 242, 427 N.E.2d 1328, 1331; *People v. Patterson* (1992), 154 Ill. 2d 414, 480, 610 N.E.2d 16, 46.

■ Defendant next argues that the trial court erred when it allowed his wife to testify to a prior consistent statement made by her to police following her arrest. The testimony came during the prosecutor's redirect examination, after defense counsel questioned Donna extensively concerning her statement. In fact, defense counsel read several statements made by Donna to the police and asked her about them. On redirect examination, the prosecutor brought out the fact that Donna had also told police that defendant had sex with J.P.'s body. The trial court overruled defense counsel's objection.

We note that this issue was not included in defendant's post-trial motion and, thus, he has waived it for consideration on appeal. In order to preserve an alleged error for review, a defendant must object at trial and include the issue in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130; *People v. Richmond* (1990), 201 Ill. App. 3d 130, 134, 559 N.E.2d 302, 305.) Therefore, we must analyze this issue under the doctrine of plain error. Plain error exists only when the substantial rights of the defendant are affected or the evidence is closely balanced. (*People v. Griffiths* (1983), 112 Ill. App. 3d 322, 326, 445 N.E.2d 521, 526; *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83, 296 N.E.2d 856, 858.) We find that neither prong of the plain-error doctrine applies here.

Defendant points us to *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41, in support of his argument. In that case, the court noted the general rule that a prior consistent statement of a witness is inadmissible, except to rebut a charge of recent fabrication or that the witness had some motive to testify falsely, and the prior consistent statement was made prior to the alleged fabrication or when the motive did not exist. Counsel for defendant had elicited testimony of prior inconsistent statements of a witness, and the State was allowed to introduce prior consistent statements on redirect examination. The court noted in its opinion that the consistent statements testified to were not relevant to the purpose for which the prior inconsistent statements had been elicited and, therefore, it was improper to allow the prior consistent statements into evidence. *Emerson*, 97 Ill. 2d at 500-01, 455 N.E.2d at 46-47.

Defendant also argues that because Donna was the key prosecution witness against him, this court should be more willing to find the existence of plain error in the admission of her prior consistent

statement. He cites *People v. Wheeler* (1989), 186 Ill. App. 3d 422, 542 N.E.2d 524, in support of his position. In that case, defendant was convicted of criminal damage to property and disorderly conduct. He was accused of throwing a brick through the window of a house. An occupant of the house testified that, after hearing a crash, he looked out a window and saw a man he recognized as defendant running down the alley and entering an automobile. This witness provided the only evidence linking defendant to the crime. Prior to trial, the defense had notified the State that it would seek to impeach the witness' testimony with his prior criminal record. The prosecution elicited testimony on direct examination regarding a statement he gave police describing the individual he saw running down the alley and the vehicle that he entered. Although defendant failed to preserve the issue for appeal, this court held that the admission of the prior consistent statement was plain error. In so holding, this court noted that proof of defendant's guilt rested almost entirely on the witness' testimony. *Wheeler*, 186 Ill. App. 3d at 428, 542 N.E.2d at 527.

Admission of Donna's prior consistent statement was error. Throughout defense counsel's questioning of Donna concerning the story she and defendant had given to police, no suggestion was made as to a recent fabrication. As defendant points out, any motive to testify falsely arose at the time of J.P.'s death. However, the admission of the prior consistent statement did not constitute plain error. Although Donna's testimony was crucial to the prosecution, it was not the only evidence connecting defendant to the crime. Defendant's former cell mate from the county jail testified as to incriminating statements made by defendant, where he admitted choking J.P. and implied having sex with her. The semen stain on J.P.'s jeans also corroborates Donna's testimony. The error was not so egregious as to deny defendant a fair trial, nor do we find the evidence closely balanced.

■Defendant's last argument is that he was improperly sentenced to natural life imprisonment because he was not proved guilty beyond a reasonable doubt of murdering J.P. in the course of committing an attempt (aggravated criminal sexual assault). Section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5—8—1(a)(1)(b) (West 1992)) allows the court to sentence a defendant to a term of natural life imprisonment if any of the aggravating factors listed in section 9—1(b) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/9—1(b) (West 1992)) are present. One of those aggravating factors exists if the victim was murdered in the course of an aggravated criminal sexual assault. (720 ILCS 5/9—

1(b)(6)(c) (West 1992).) It has been held that an attempt to commit one of the qualifying felonies is sufficient to trigger application of this section. See *People v. Ramirez* (1983), 98 Ill. 2d 439, 458-59, 457 N.E.2d 31, 40.

The defendant also argues he cannot be sentenced to natural life because the State failed to prove the attempt (aggravated criminal sexual assault) beyond a reasonable doubt. We disagree, but find that "beyond a reasonable doubt" is not the test. We disagree with the decision in *People v. Davis* (1992), 233 Ill. App. 3d 878, 600 N.E.2d 88.

Section 5—8—1(a)(1)(b) of the Corrections Code provides for a possible natural life sentence if any of the aggravating factors listed in section 9—1(b) of the Criminal Code are present. Section 5—8—1(a)(1)(b) of the Corrections Code (730 ILCS 5/5—8—1(a)(1)(b) (West 1992)) specifically provides that "if the court finds *** any of the aggravating factors *** present, the court may sentence the defendant to a term of natural life imprisonment." It is clear that the court at sentencing (possibly not the fact finder) is making this determination.

In *People v. Williams* (1992), 149 Ill. 2d 467, 599 N.E.2d 913, our supreme court held that " 'the judge in determining the character and extent of punishment is not limited to considering only information which would be admissible under the adversary circumstances of a trial.' " (*Williams*, 149 Ill. 2d at 492, 599 N.E.2d at 924, quoting *People v. Adkins* (1968), 41 Ill. 2d 297, 300, 242 N.E.2d 258, 260.) *Williams* also specifically acknowledges that "the rules of evidence that govern the guilt or innocence phase of a trial are not applicable at sentencing. Instead, a sentencing judge is given broad discretionary power to consider various sources and types of information ***." *Williams*, 149 Ill. 2d at 490, 599 N.E.2d at 924.

Defendant argues that postmortem attempts at sexual penetration do not constitute attempt (aggravated criminal sexual assault). He also argues that the State failed to prove his intent to commit an act of forcible penetration. Criminal sexual assault is defined in part:

"(a) The accused commits criminal sexual assault if he or she:

(1) commits an act of sexual penetration by the use of force or threat of force." (720 ILCS 5/12—13(a)(1) (West 1992).)

"Sexual penetration" is defined as:

"Definitions. For the purposes of Sections 12—13 through 12—18 of this Code, the terms used in these Sections shall have the following meanings ascribed to them:

\* \* \*

(f) 'Sexual penetration' means any contact, however slight, between the sex organ of one person and the sex organ, mouth or

anus of another person, or any intrusion, however slight, of any part of thè body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (720 ILCS 5/12—12 (West 1992).)

An accused commits aggravated criminal sexual assault when certain factors exist, among which are:

"(2) the accused caused bodily harm to the victim; or

(3) the accused acted in such a manner as to threaten or endanger the life of the victim or any other person; or

(4) the criminal sexual assault was perpetrated during the course of the commission or attempted commission of any other felony by the accused; or

(5) the victim was 60 years of age or over when the offense was committed." (720 ILCS 5/12—14(a)(2) through (a)(5) (West 1992).)

"A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8—4(a) (West 1992).

We need not address defendant's argument that his postmortem attempts at penetrating J.P. were insufficient to make him eligible for a natural life sentence. We hold the evidence was sufficient to permit the jury to conclude that defendant took a substantial step toward commission of the offense of aggravated criminal sexual assault while J.P. was still alive. Defendant cites *People v. Rayfield* (1988), 171 Ill. App. 3d 297, 525 N.E.2d 253, as being similar to this case. In *Rayfield*, defendant walked into the victim's apartment and began to have a conversation with her. In the course of the conversation, defendant asked if he could hold the victim. This took place on the porch of the apartment. The victim allowed defendant to hold her, but when she asked to be released, defendant refused. The victim began to scream and struggle. Defendant covered her mouth and threatened to kill her if she continued to scream. He picked her up and carried her inside the apartment toward the bedroom. The victim told him she did not want to do anything and defendant put her down. They sat on a couch and continued to talk. Prior to leaving, defendant asked to look at the victim's vagina, a request which was refused. The victim asked defendant to leave, which he did. Defendant was convicted of attempt (criminal sexual assault), but this conviction was reversed on appeal. The court stated that in determining intent to forcibly commit an act of penetration, it was necessary to look at defendant's acts and utterances. The court noted that defendant did not order the victim to disrobe, nor did he make any overt act toward his own genitals or toward the victim. He never

touched her breasts or buttocks and did not indicate a desire to do anything of a sexual nature. Although he requested to see the victim's vagina, he left after this request was refused. *Rayfield*, 171 Ill. App. 3d at 299-300, 525 N.E.2d at 255.

Defendant's reliance on *Rayfield* is misplaced. There was testimony that defendant had stated at Mr. Lucky's he wanted to have sex with J.P. He himself testified that after he removed J.P.'s bra, he touched her breast in an attempt to see if she would consent to sex. J.P. told him to stop. Donna testified that after putting medicine on J.P.'s back, defendant told her to take off J.P.'s pants. Donna complied and pulled them off while defendant held J.P.'s arms. This was necessary because J.P. was fighting them. It was at this point that Donna saw J.P. had defecated in her pants. Donna also testified that J.P. refused to be cleaned up and that she pulled her pants back on and threatened to report defendant and Donna to the police. At this point, defendant began to choke J.P., ultimately killing her. Donna further testified that sometime prior to killing J.P., defendant removed all of J.P.'s clothes. The semen stain on J.P.'s pants corroborates Donna's testimony and provides evidence of defendant's intent to commit an act of forcible penetration. Additional corroboration of defendant's intent is also provided by the testimony of Anthony Robinson, defendant's former cell mate, that defendant said J.P. had gotten what she wanted and that he had gotten what she came to his house for. The fact that the act of penetration itself may have occurred after J.P.'s death does not nullify the acts constituting the attempt, which sufficed to meet the "in the course of" language of section 9—1(b)(6) of the Criminal Code (720 ILCS 5/9—1(b)(6) (West 1992)), while she was still alive.

For the reasons stated, defendant's convictions and sentences are affirmed.

Affirmed.

COOK and STEIGMANN, JJ., concur.