2021 IL App (1st) 171204-UB

FOURTH DIVISION
December 30, 2021

No. 1-17-1204

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 21044 |
| MARSHALL BAKER, | ) ) | |
| Defendant-Appellant. | ) ) | |
| | ) ) ) | Honorable Arthur F. Hill, Jr., Judge Presiding. |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Affirming the judgment of the circuit court of Cook County where (1) no plain error occurred from the trial court's admission of certain other-crimes evidence; (2) the trial court did not abuse its discretion in admitting certain evidence; (3) the jury was properly instructed; and (4) the prosecutor's statements during closing argument were not improper.

¶ 2    This case is before us on remand from a supervisory order issued by our supreme court.

Following a jury trial, defendant Marshall Baker was convicted of three counts of aggravated

criminal sexual assault, aggravated criminal sexual abuse, armed robbery, and home invasion. He was sentenced to a term of natural life. On appeal, defendant maintains that: (1) the trial court abused its discretion when it admitted certain other-crimes evidence; (2) the trial court erred when it allowed the State to admit three prior statements of the complainant into evidence; (3) the trial court failed to properly instruct the jury; and (4) the prosecutor made numerous remarks during closing arguments which prejudiced defendant and denied him a right to a fair trial.

¶ 3    On May 13, 2021, this court issued a decision affirming defendant's convictions and sentence. *People v. Baker*, 2021 IL App (1st) 171204-U. On June 28, 2021, defendant filed a petition for leave to appeal (PLA) to the Illinois Supreme Court from that order. On September 29, 2021, our supreme court issued a supervisory order denying the PLA, but in that order, the supreme court directed us to vacate our initial order and:

> "address on the merits defendant's argument that the admission of evidence that
>
> defendant had previously committed the offenses of home invasion and attempted
>
> criminal sexual assault against M.M. for any relevant purpose, including propensity, as
>
> provided by section 115-7.3(b) of the Code of Criminal Procedure (725 ILCS 5/115-
>
> 7.3(b)), was plain error, and determine if a different result is warranted." *People v.*
>
> *Baker*, No. 127400 (Ill. Sep. 29, 2021) (supervisory order).

¶ 4    Upon consideration of the matter in light of our supreme court's supervisory order, we affirm the judgment of the circuit court.

¶ 5                                BACKGROUND

¶ 6    Defendant was charged by indictment with multiple counts of aggravated criminal sexual assault, aggravated criminal sexual abuse, armed robbery, home invasion, and residential

burglary of the victim, B.C. The indictments generally alleged that on September 26, 2013, defendant entered the apartment of B.C. while she was asleep and sexually assaulted her while at the same time threatening her with a knife. After the sexual assault, defendant then removed some money and a laptop computer from B.C.'s residence without her permission.

¶ 7                                    Pretrial

¶ 8     The State filed a pretrial motion to admit proof of other crimes. In the motion, the State sought to introduce evidence that defendant had committed four other sexual assaults. Each of these four sexual assaults occurred within a half-mile radius of each other in the Back of the Yards neighborhood. In addition, three of these offenses occurred over a four-day period. The first occurred on August 1, 1987, when defendant entered the residence of 16-year-old J.C. The defendant came in through an open window in the middle of the night. Defendant was armed with a screwdriver and used it to threaten the victim. He placed the screwdriver against her neck and told her not to scream or he would hurt her. He then performed oral sex on her and forced his penis into her vagina. Defendant then, after demanding some money, proceeded to go through her purse and removed some of the currency therein. He told the victim not to call the police or he would come back and then he fled from the house. The victim immediately cried out for her mother and the police were notified. The victim was subsequently treated at the hospital.

¶ 9     In addition to the assault on J.C., on March 26, 1988, defendant assaulted 18-year-old D.S. who was asleep on the couch when defendant broke into her home. At the time, defendant was armed with two knives and a firearm. He demanded D.S. disrobe or he would harm her. Defendant then forced his penis into her vagina and then forced her to perform oral sex on him. Defendant stopped and fled after D.S. told him her boyfriend would be home at any moment.

Once D.S.'s boyfriend arrived, she cried out, and the police were contacted. Defendant was placed in a lineup and D.S. identified him as her attacker. Defendant was charged with aggravated criminal sexual assault, armed robbery, and home invasion. He pled guilty and was sentenced to 25 years' imprisonment (concurrent with the cases discussed herein).

¶ 10    On March 29, 1988, defendant entered the home of 11-year-old M.M. She was sleeping on her couch when she was awakened by the defendant who held a knife to her face. Defendant told her to remove her clothes, or he would kill her. M.M. disrobed down to her underwear and ran screaming into her sister's bedroom. M.M.'s brother came downstairs armed with a stick and defendant fled the house. On March 31, 1988, M.M. and her sister positively identified defendant in a lineup. Defendant was charged with home invasion and attempted aggravated criminal sexual assault. He pled guilty and was sentenced to 25 years' imprisonment (concurrent with the cases discussed herein).

¶ 11    That same evening, March 29, 1988, defendant came back to J.C.'s residence. She was asleep in her bed when she awoke to find defendant standing over her. He placed his hand over her mouth and held a knife to her throat. Defendant then forced his penis into her vagina and forced her to perform oral sex on him. During this assault, defendant continued to force the victim to engage in multiple acts of vaginal and oral sex. Defendant afterwards retrieved a glass of water from the kitchen and used the water and a towel to clean the victim. At the end of the encounter, defendant again demanded money or jewelry from the victim and took a $2 bill from her nightstand. After defendant left, the victim again cried out for her mother and the police were contacted. She reported that it was the same individual who had previously assaulted her. Fingerprints were lifted from the glass defendant used during the assault and defendant was identified. Thereafter, the victim identified defendant in a lineup as the person who raped her in

August 1987 and March 1988. Defendant was charged and pled guilty to both rapes. He was sentenced to 25 years' imprisonment (concurrent with three other cases discussed herein).[1]

¶ 12    In support of its motion to admit, the State maintained that it should be permitted to use the evidence of these other crimes to prove defendant's propensity to commit sex offenses, or for any of the other purposes, such as to prove motive, intent, identity, absence of mistake or accident, the existence of a common plan or design, or *modus operandi*. The State argued the trial court should permit the victims to present evidence of these assaults as their probative value outweighs the danger of unfair prejudice. Specifically, the State argued that the trial court should not consider the time defendant spent in prison when calculating the proximity in time between the other crimes and the current offense. The State observed that while it had been twenty-five years since the assaults in 1987-88, the defendant, however, had only been out of custody for five of those twenty-five years. The State next argued that the similarities between the assaults was striking. In each of the cases the defendant surprised his victims by breaking into their homes in the middle of the night as they slept. All the crimes occurred between the hours of 1 a.m. and 5 a.m. and occurred within a half-mile radius of each other in the Back of the Yards neighborhood. In each offense, defendant awakened the young females while brandishing a weapon and threatened to physically harm them if they did not comply with his requests. Each victim was a young female between the ages of 11 and 21. In addition to the sexual acts, defendant would take property from each of the victims, aside from M.M. (because he was chased from her home).

¶ 13    Regarding other relevant facts and circumstances, the State argued that allowing the jury

---

[1] Defendant pled guilty in four cases:  two involving J.C., one involving D.S., and one involving M.M.

to only hear about B.C.'s rape would create the false impression that this was an isolated incident when, in fact, defendant has demonstrated a clear pattern of preying on young, unsuspecting females.

¶ 14     In response, defense counsel argued that the weight of the other crimes evidence would subject defendant to receiving an unfair trial.

¶ 15     After hearing oral arguments from the parties, the trial court granted the State's motion to admit.  The court allowed the State to introduce the other-crimes evidence during the trial to demonstrate motive, intent, absence of innocent frame of mind and, consistent with *People v. Donoho*, 204 Ill. 2d 159 (2003), propensity.

¶ 16                                 Trial

¶ 17                          *B.C.'s Testimony*

¶ 18     The State presented the following evidence at trial.  B.C., age 21 at the time of the offense, testified that on September 25, 2013, she resided on the 4800 block of South Justine with her three-year-old son.  On the evening in question, she placed her son to bed in his room and she went to sleep.  At 4:20 a.m. she awoke to the feeling of pressure from a knife that had been placed against her neck and there was a man she did not know kneeling on the side of her bed.  B.C. identified defendant as the man.  Defendant had placed a pair of her underwear over his head and face.  B.C., however, was able to see part of his face through one of the leg holes. She was also able to observe that he was bald and had gray hair in his beard.  She told defendant to leave and that she has a son.  Defendant replied that he had a friend who was with her son in the other room, and he would hurt her son if she did not obey him.  Defendant then forced his fingers into her vagina and then put his mouth and tongue into her vagina.  When B.C. started to cry, defendant pulled her shirt up over her face and then placed his hands and mouth on her

breasts. Defendant told B.C. to turn over and he placed his tongue in her anus. Defendant told B.C. to turn back around, and he pulled out a plastic bag containing white powder from his pocket. He then pulled out a glass pipe and smoked the white powder from the pipe. Defendant ordered B.C. not to get up until she heard him close the door. Defendant left carrying her laptop. She later discovered he had taken money from her purse as well. After she heard the door close, B.C. ran to lock the door and checked on her son who was still asleep. B.C. then called her boyfriend and then 911. She was taken to the University of Illinois at Chicago Hospital where a sexual assault kit was performed. On October 16, 2013, she went to the police station where she identified defendant in a lineup.

¶ 19    On cross-examination, B.C. testified she had an injury on her neck from the knife but did not receive any treatment for it at the hospital. She also acknowledged that she did not inform the police officers that defendant had taken her computer.

¶ 20                    *Police Officer Testimony*

¶ 21    Police Officer Andrew Mazintas of the Chicago Police Department testified that on September 26, 2013, he was dispatched to B.C.'s residence, arriving at 5 a.m. He and his partner met with B.C. and she informed them that she was sleeping when she awoke to a strange man in her bedroom who had a knife in his hand. The man said to her "do what I say, or I will hurt you." The man also said that he was with someone else and they were in her son's room and if she did not cooperate something bad would happen to her son. B.C. further told the officers that the man placed his fingers into her vagina and licked her genitals and anus. In addition, B.C. informed them that the man took some money and then left. Officer Mazintas then escorted B.C. to the hospital.

¶ 22                                    *Forensic and Medical Testimony*

¶ 23    Evidence technician William Stec of the Chicago Police Department testified that at

6:46 a.m. on September 26, 2013, he received an assignment to respond to an aggravated sexual

assault at B.C.'s residence.  He processed the front door, kitchen counter, rear bedroom, and

front living room for fingerprints.  He did not find any fingerprints suitable for lifting.  On cross-

examination, Stec testified he did not recover a knife from the residence and there was no

evidence of a forced entry.

¶ 24    Saly Joseph,[2] a nurse at University of Illinois Chicago Hospital, testified that on

September 26, 2013, at 7 a.m. she performed a sexual assault kit on B.C. who told her she had

been sleeping when an assailant woke her up, held a knife to her neck, and sexually assaulted

her.  The details of the assault were consistent with B.C.'s testimony.  Joseph conducted a

physical examination of B.C. and discovered a very small skin abrasion under her chin that was

three centimeters long.  As part of the sexual assault kit, swabs were taken on various parts of

B.C.'s body, including her breasts, vagina, and anus.

¶ 25    Detective Andrew Perostianis of the Chicago Police Department testified that on

October 10, 2013, he was assigned to follow up on the assault to B.C.  His office had received a

notification from the Illinois State Police Crime Lab that there was an association to a suspect

from the DNA obtained from the sexual assault kit.  The suspect was defendant and Detective

Perostianis issued an investigative alert for his arrest.  Defendant was arrested on October

16, 2013, and Detective Perostianis obtained a buccal swab from him.  Defendant was then

placed in a lineup where B.C. identified him as her assailant.

¶ 26    Dr. Jennifer Wagemaker, a forensic biologist for the Illinois State Police, testified as an

---

[2] This is the proper spelling of her name.

expert in the field of forensic biology without objection. Dr. Wagemaker testified she preserved the biological fluids from B.C.'s sexual assault kit and defendant's buccal swab for further analysis.

¶ 27 Dr. Andrew Garinger, a forensic DNA analyst with the Illinois State Police Laboratory, testified he received the vaginal swab, the breast swab, and a blood standard from B.C. From the breast swab, Dr. Garinger discovered a mixture of at least two individuals, one of whom was male. Dr. Garinger placed the male DNA profile in the database and discovered an association with defendant. He requested an additional DNA standard from defendant.

¶ 28 Dr. Garinger testified he was not able to link any DNA profiles from defendant to the vaginal swab; however, he did testify that it is possible for a mouth to touch a body part and not leave enough detectable DNA. According to Dr. Garinger it is easier to collect DNA from dry skin than it is an area where there is a mucus membrane, such as the vagina.

¶ 29 Brian Schoon, a forensic scientist with the Illinois State Police Forensic Science Center at Chicago, testified as an expert in the field of forensic DNA analysis. According to Schoon, he tested the anal swab recovered from B.C. and identified a low level partial mixture of human DNA profiles from at least two individuals, but it was unsuitable for comparison.

¶ 30 Lisa Kell, a forensic scientist with the Illinois State Police Forensic Science Center at Chicago, testified as an expert in the field of forensic DNA analysis. She received a buccal swab from defendant and from that swab obtained a DNA profile suitable for comparison. She compared defendant's DNA profile with the profile obtained from the breast swab and opined that defendant's DNA matched the DNA on the breast swab. According to Kell, this profile would be expected to occur in approximately one in 1.2 sextillion African Americans, one in 140 quintillion Caucasians, or one in 870 quintillion Hispanic unrelated individuals.

¶ 31    Jeanne Hutcherson of the Illinois State Police Forensic Science Center testified as an expert in fingerprint analysis.  According to Hutcherson, no suitable latent fingerprints were recovered from the scene.

¶ 32                                    *Previous Victims' Testimony*

¶ 33    The State then presented the testimony of two of defendant's prior sexual assault victims as other-crimes evidence.  M.M. testified that on March 29, 1988, she was 11 years old.  At 3:30 a.m. that morning, she was asleep on the living room sofa when she awoke to defendant standing over her with a knife.  Defendant told her that if she screamed he would kill her.  Defendant ordered her to take off her clothes and repeated his threat.  When she was in only her underwear, she ran down the hallway to her 16-year-old sister's room and told her sister that there was a man in the house making her take off her clothes.  Her sister jumped out of bed and ran to the front of the house.  M.M. then woke up her 15-year-old brother and he grabbed his weight bar and ran toward the front of the house where her sister was wrestling with defendant to shut the front door.  Her sister was able to close and lock the door.  They then were able to get a better look at defendant's face as he peered through the window.  M.M.'s sister called 911.  On March 31, 1988, M.M. identified defendant in a lineup and defendant was convicted in her case.

¶ 34    J.C. testified that on August 1, 1987, she was 16 years old.  At 3:30 a.m. she woke to someone tugging on her nightgown.  She did not recognize anyone in the courtroom as the individual who woke her up that evening.  The individual pointed a screwdriver at her face and said, "don't make me hurt you."  He then forced his penis into her vagina and placed his mouth on her vagina.  After he left, she discovered money was missing from her apartment.  She called the police and was taken to the hospital where a sexual assault kit was collected.

¶ 35    J.C. further testified that defendant sexually assaulted her on March 29, 1988.  At 4 a.m.

she was suddenly awakened when she felt a hand on her face. It was the same person who had raped her in August 1987, and he was armed with a knife. He told her to be quiet and he forced his penis into her vagina and mouth and put his mouth on her vagina. He then left the room and came back with a glass of water and a kitchen towel. He wet the towel and wiped her vaginal area and left. On March 31, 1988, she identified defendant in a lineup. Defendant was convicted of these offenses.

¶ 36    Certified copies of the indictments and convictions for the offenses committed against M.M. and J.C. were admitted into evidence and published to the jury.

¶ 37    The State rested and defendant moved for a directed verdict on counts 1 and 2 of the indictment due to lack of evidence of anal penetration, which the trial court denied.

¶ 38                                    *Defendant's Testimony*

¶ 39    Regarding the offense at issue, defendant testified as follows. On September 26, 2013, he met up with his friend Maria at a local drug house in the Back of the Yards neighborhood. Defendant testified he did not know Maria's last name, but that he had known her for a year-and-a-half. After "drinking and drugging" with Maria for about an hour-and-a-half (which consisted of them ingesting alcohol, crack cocaine (crack), and marijuana), Maria suggested that they go to a different location. Maria took defendant to B.C.'s apartment, which was about a block away from the drug house. Maria let defendant into B.C.'s apartment. As they entered, Maria went to the back of the apartment to get B.C. Defendant sat on the couch in the living room. Maria and B.C. joined him and they all smoked crack together for about 30 minutes to an hour when Maria left to go purchase more crack with $30 defendant had given her. Defendant testified that he still had some crack in his possession when Maria left.

¶ 40    After Maria left, defendant and B.C. talked. B.C. asked defendant to lace her marijuana

cigarette with some crack cocaine. Defendant then offered to give her the crack cocaine if she were to engage in sex acts with him, but B.C. was not willing to do so. In response, defendant explained that he "really [did not] want to do nothing because you know smoking crack *** don't make me horny in any kind of way." Defendant then asked if he could kiss her breast. B.C. held her shirt up as he kissed her breast and slapped her "on the behind." Defendant testified he engaged in sexual relations with B.C. for 10 minutes; however, on cross-examination he testified it did not last 10 minutes and was "just" a kiss. Afterward, defendant gave B.C. the drugs and then left B.C.'s apartment to find Maria.

¶ 41    Regarding his sexual encounter with B.C., defendant testified as follows:

"Q. So you weren't interested in any sort of sexual interaction with her. You just felt like doing that?

A. Yeah, some sexual interaction but no.

Q. So you weren't interested in having sexual activity with [B.C.]?

A. Exactly yes.

Q. You wanted to?

A. Yes.

Q. And you started by putting your mouth on her breast; is that correct?

A. Yes.

Q. And you went further than that, didn't you?

A. No.

Q. Why not?

A. I was looking for crack. I was waiting on the crack to come back. The crack

didn't come back fast enough, so I went looking for the crack. Had the crack came back,

then maybe we went further."

Defendant explained that slapping B.C. on the buttocks was meant to be "sarcastic" and that he

observed a pair of boxer shorts "sitting on the bed" so he put them on his head as a joke.

¶ 42    Defendant denied committing any acts of sexual penetration by force upon B.C., denied

possessing a knife in B.C.'s apartment, and denied taking a laptop and money by threat of force.

He further testified that he had resided in the Back of the Yards neighborhood all of his life.

¶ 43    On cross-examination, defendant refused to answer questions regarding the details of the

assaults on M.M. and J.C. other than acknowledging he pled guilty in those cases. He also

testified that B.C. gave him $7 or $8 to purchase crack. Regarding the effects of crack cocaine

on his ability to become sexually aroused, defendant testified that smoking crack cocaine does

not "make you want to do sexual things" it "just makes you want to smoke more." He denied

that he kissed B.C.'s breast because he was sexually aroused and only did so "because the

opportunity presented itself."

¶ 44    The defense rested and in rebuttal, the State presented the testimony of B.C. She denied

smoking crack with Maria and defendant in her living room. She also testified she did not

consent to defendant placing his mouth on her breast.

¶ 45    The State sought to admit a certified copy of defendant's conviction for residential

burglary wherein he pled guilty on August 15, 2008. The trial court admitted it into evidence for

the purpose of impeachment and it was published to the jury.

¶ 46    Outside of the presence of the jury, the trial court conducted a jury instructions

conference. The State requested that the jury be provided with Illinois Pattern Jury Instructions

Nos. 3.13 and 3.14 regarding the other crimes evidence. Defendant raised a general objection to these instructions but did not recommend any alternative language for the instructions.

¶ 47     Defendant also requested a theft instruction (Illinois Pattern Jury Instruction No. 13.01) and the State objected. Defense counsel argued that defendant's testimony demonstrated he took seven dollars from B.C. with the intent to purchase drugs, but did not return with the drugs nor did he return the money to B.C. The trial court declined to provide the theft instruction.

¶ 48     After hearing closing arguments, the jury deliberated and found defendant guilty of aggravated criminal sexual assault (tongue to anus), aggravated criminal sexual assault (tongue to vagina), aggravated criminal sexual assault (finger to vagina), home invasion, armed robbery, and aggravated criminal sexual abuse. Defendant filed a motion for a new trial and an amended motion for a new trial, which were denied. The trial court held a sentencing hearing and ultimately sentenced defendant to natural life in prison.

¶ 49     This appeal followed.

¶ 50                           ANALYSIS

¶ 51     On appeal, defendant maintains: (1) the trial court abused its discretion when it admitted certain other-crimes evidence; (2) the trial court erred when it allowed the State to admit three prior statements of the complainant into evidence; (3) the trial court failed to properly instruct the jury; and (4) the prosecutor made numerous remarks during closing arguments that prejudiced defendant and denied him a right to a fair trial. We address each issue in turn.

¶ 52                      Other-Crimes Evidence

¶ 53     Generally, evidence concerning other crimes is inadmissible if it demonstrates a propensity to commit a crime. *Donoho*, 204 Ill. 2d at 170. "The evidence is not considered irrelevant; rather, it is considered to be too likely to persuade the jury to convict the defendant

based on his past bad behavior." *People v. Raymond*, 404 Ill. App. 3d 1028, 1045 (2010). The Illinois legislature made an exception to the common law bar against the use of other crimes evidence to show propensity in the case of certain sexual crimes. Section 115-7.3 of the Code of Criminal Procedure of 1963 (the Code) states in pertinent part that when the defendant is accused of aggravated criminal sexual assault, "evidence of the defendant's commission of another offense or offenses *** may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3 (West 2012).

¶ 54    Our supreme court has found that this statute allows courts to admit evidence of other crimes to demonstrate the defendant's propensity to commit sex offenses. *Donoho*, 204 Ill. 2d at 176. Other crimes evidence is admissible to prove certain facts, such as "intent, *modus operandi,* identity, motive, [and] absence of mistake," but may still be excluded "if the prejudicial effect of the evidence substantially outweighs its probative value." *Id.* at 170. The key to balancing the probative value of propensity of other crimes evidence against its possible prejudicial effects, is to avoid admitting evidence that entices a jury to find the defendant guilty "*only* because it feels he is a bad person deserving punishment." (Emphasis in original.) *People v. Childress*, 338 Ill. App. 3d 540, 548 (2003) (citing *People v. Lima*, 328 Ill. App. 3d 84, 96 (2002)). In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2012).

¶ 55    Whether the trial court erred in admitting other crimes evidence against the defendant is reviewed for an abuse of discretion. *Raymond*, 404 Ill. App. 3d at 1044. A trial court abuses its

discretion only when its ruling is arbitrary, fanciful, or where no reasonable person would take the view adopted by the trial court. *Id.* at 1044-45.

¶ 56                                            *J.C.*

¶ 57    Defendant first maintains that the trial court erred when it failed to conduct a balancing test when it ruled that the evidence pertaining to the offenses against J.C. were admissible. Similar to his previous argument, defendant asserts that the fact the offenses against J.C. occurred 25 years ago rendered their probative value greatly diminished. He further asserts that the prejudicial impact of J.C.'s testimony was great where J.C. was 16 years old at the time of the offenses and juries are sensitive to the effects of a crime committed on young people. Accordingly, defendant requests we find the trial court's failure to conduct a balancing test was reversible error in this instance.

¶ 58    In response, the State maintains that the trial court did conduct a balancing test after reading its motion and hearing argument from counsel and that the trial judge is presumed to know and follow the law unless the record indicates otherwise. See *People v. Casillas*, 195 Ill. 2d 461, 486 (2000) (finding that while the trial judge did not expressly articulate she was balancing the probative value of the defendant's prior convictions against their prejudicial impact, it was evident from the transcript the trial judge followed the law). We agree with the State.

¶ 59    The case law requires a trial judge to engage in a "meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186. As argued by the State, a trial judge is presumed to know the law, and a reviewing court will ordinarily presume the trial judge followed the law unless the record indicates otherwise. *People v. Robinson*, 368 Ill. App. 3d 963, 976 (2006). The record, here, demonstrates the trial court

reviewed the State's written motion and listened to oral argument from the parties, which included defendant's argument regarding the length of time between the offenses. The trial court then recited relevant case law and issued a ruling. The other crimes evidence regarding J.C. provided the jury with a pattern of conduct relevant to defendant's state of mind, motive, and propensity—that he would enter the residence of a young woman in the middle of the night and would threaten her with a weapon before sexually assaulting her. See *People v. Deavers*, 220 Ill. App. 3d 1057, 1075 (1991) (finding the evidence in question to be strongly probative and suggestive of the state of mind that the defendant would be inclined to commit the acts about which the victim complained). Accordingly, we conclude that the trial court did not abuse its discretion by admitting the other crimes evidence as to J.C. in this case. See *People v. Groel*, 2012 IL App (3d) 090595, ¶ 44 (finding the evidence established a pattern of conduct relevant to the defendant's motive and propensity).

¶ 60                                    *M.M.*

¶ 61    Defendant raises two errors in the trial court's admission of M.M.'s testimony during his trial. We address each error in turn.

¶ 62                          Illinois Rule of Evidence 404(b)

¶ 63    Defendant argues the trial court abused its discretion when it allowed the evidence of the offense against M.M. to be presented to the jury. Defendant asserts that the trial court improperly allowed this evidence to demonstrate his motive and intent to commit the alleged offenses against B.C. under Illinois Rule of Evidence 404(b) and the common law. Specifically, defendant maintains that the State failed to demonstrate how the incident against M.M., which occurred 25 years before, provided defendant with a motive to assault B.C. Defendant further maintains that the State failed to demonstrate that defendant intended to sexually assault M.M.

as "the act was never completed." Thus, defendant argues, the jury was left to speculate whether defendant's prior conduct toward M.M. was meaningful as to the issue of intent in this case.

¶ 64     The State responds that the trial court properly admitted the evidence for other purposes including motive, intent, absence of innocent frame of mind, and lack of consent. The State observes that the evidence of crimes committed against M.M. was most relevant to demonstrate lack of consent and any lack of mistake by way of the similarities between the crimes. The State further observes that while 25 years had passed between the offenses against M.M. and those against B.C., defendant was not incarcerated for only five of those years. The State also argues that defendant's intent was clear where he broke into M.M.'s home while she was asleep, held a knife to her face, ordered her to take her clothes off, and threatened to kill her.

¶ 65     Our supreme court has repeatedly held that evidence of other crimes or bad acts is admissible if it is relevant for any purpose other than to show a defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Rule 404(b) provides that evidence of other crimes, wrongs, or acts may be admissible for purposes other than to show propensity, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, lack of consent, or absence of mistake or accident. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Other crimes or bad acts evidence may also be permissibly used to show, by similar acts or incidents, that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge. 1 John W. Strong, McCormick on Evidence § 190, at 660, 664 (5th ed. 1999). Where such other crimes or bad acts evidence is offered, it is admissible so long as it bears some threshold similarity to the crime charged. *People v. Cruz*, 162 Ill. 2d 314, 348-49 (1994). The admissibility of other crimes or bad acts evidence rests within the sound discretion of the circuit court, and its decision on the matter will not be disturbed absent a clear abuse of discretion.

*People v. Heard*, 187 Ill. 2d 36, 58 (1999).

¶ 66    We first address defendant's contention that the offense against M.M. was too far removed in time from the offense against B.C. to be relevant in B.C.'s case.   Our supreme court has noted that "the admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged."  *People v. Illgen*, 145 Ill. 2d 353, 370 (1991).  Courts have found decades-old other crimes evidence admissible where it is sufficiently credible and probative.  See, *e.g.*, *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 37 (20 years between offenses); *People v. Smith*, 2015 IL App (4th) 130205, ¶ 29 (12 to 18 years between the offenses); *People v. Davis*, 260 Ill. App. 3d 176 (1994) (finding that other crimes evidence was admissible where the other crime occurred more than 20 years prior to the charged offense).  Consequently, we determine that the age of the convictions here did not bar its admission.

¶ 67    Defendant also argues that M.M.'s testimony was not relevant as it lacks sufficient similarity to B.C.'s case.  We disagree.  M.M.'s testimony regarding defendant was highly relevant as it was nearly identical to the offense committed against B.C. and demonstrated defendant's intent and established that the act in question was not performed inadvertently, accidentally, or involuntarily.  Defendant was charged with attempted aggravated criminal sexual assault and home invasion.  To commit the offense of attempted aggravated criminal sexual assault, defendant must have taken a substantial step toward the commission of the offense of aggravated criminal sexual assault.  A person commits criminal sexual assault if "that person commits an act of sexual penetration" and either "uses force or threat of force" or "the victim is under 18 years of age."  720 ILCS 5/11-1.20 (West 2012).  The offense becomes aggravated when the person commits criminal sexual assault and, as in this instance, "the person displays,

threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon." 720 ILCS 5/11-1.30(a)(1) (West 2012).

¶ 68    Similar to B.C.'s case, defendant entered M.M.'s home in the middle of the night while she was asleep. Defendant then awakened M.M. and held a knife to her face. Defendant ordered M.M. to get completely undressed. When she was about to remove her underwear, M.M. escaped from the defendant and ran down the hallway and cried out to her sister. Defendant was then chased out of M.M.'s home by her brother and sister. In B.C.'s case, defendant was charged with aggravated criminal sexual assault and home invasion. Although defendant did not commit aggravated criminal sexual assault upon M.M. (it was charged as an attempt offense), the evidence did support a charge of home invasion. Moreover, defendant's conduct toward M.M. does support *attempted* aggravated criminal sexual assault. While defendant did not touch M.M., he did order her to disrobe completely which strongly suggests that defendant intended to have sex with her. See *People v. Decaluwe*, 405 Ill. App. 3d 256, 265-66 (2010) (asking a victim to disrobe can demonstrate a defendant's intent to commit a sex act). Consequently, we find the trial court did not abuse its discretion in admitting M.M.'s testimony for the purpose of demonstrating defendant's intent.

¶ 69                  Section 115-7.3 of the Code of Criminal Procedure

¶ 70    Defendant next argues that the trial court erred when it allowed the State to introduce evidence that he had previously committed the offenses of home invasion and attempted criminal sexual assault against M.M. for any relevant purpose, including propensity, as provided by 725 ILCS 5/115-7.3 (West 2012). Defendant maintains that the evidence did not establish that he committed one of the enumerated offenses listed in subsection (a) of the statute. Accordingly,

the trial court erred in admitting the prior acts against M.M. under section 115-7.3.

¶ 71    In response, the State maintains that defendant has forfeited this argument by failing to raise it in the trial court and by failing to request plain-error review on appeal.  In reply, defendant acknowledges that this specific statutory argument was not raised before the trial court; however, he argues he did generally object to the admission of other crimes evidence and therefore it is preserved on appeal.  In the alternative, defendant requests this court review his claim for plain error.  Under the direction of our supreme court's supervisory order, we will review defendant's claim for plain error despite his forfeiture.

¶ 72    The plain-error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.  *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).  Defendant bears the burden of persuasion regarding whether the evidence was closely balanced or whether the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process.  *People v. Herron*, 215 Ill. 2d 167, 178 (2005).

¶ 73    Under the common law, other-crimes evidence normally is inadmissible if offered only to demonstrate the defendant's propensity to commit the charged crime.  *Donoho*, 204 Ill. 2d at 170; *People v. Manning*, 182 Ill. 2d 193, 213 (1998).  Evidence regarding other crimes generally is admissible only if offered to prove intent, *modus operandi,* identity, motive, absence of mistake, or any relevant fact other than propensity.  *Donoho*, 204 Ill. 2d at 170; *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991).  When evidence of other crimes is offered, the trial judge must

weigh its probative value against its prejudicial effect and may exclude the evidence if its prejudicial effect substantially outweighs its probative value. *Illgen*, 145 Ill. 2d at 365.

¶ 74    Section 115-7.3 of the Code provides an exception to the general rule in criminal cases where, as here, a defendant is accused of aggravated criminal sexual assault. 725 ILCS 5/115-7.3(a)(1) (West 2012). In such cases, "evidence of the defendant's commission of another offense or offenses set forth in paragraph (1), (2), or (3) of subsection (a), or evidence to rebut that proof or an inference from that proof, may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2012). An analysis under the Code also involves weighing the probative value of the evidence against the prejudicial effect. *People v. Sundling*, 2012 IL App (2d) 070455-B, ¶ 77.

¶ 75    Here, defendant maintains that error occurred where the trial court admitted M.M.'s testimony under section 115-7.3 and that this was first-prong plain error where the evidence was closely balanced. Specifically, defendant asserts that the evidence against him was not overwhelming. In particular, defendant notes that the location of where his DNA was discovered was consistent with both his and B.C.'s account of events. Defendant further notes that the State presented no other witnesses who observed what occurred. Defendant concludes that the evidence presented essentially amounted to a credibility contest and thus the evidence was closely balanced.

¶ 76    Even if the admission of this evidence under section 115-7.3 was error, we find that the evidence was not closely balanced as defendant suggests. See *People v. White*, 2011 IL 109689, ¶ 134 (conducting a plain-error analysis without first determining whether error occurred). In support of his closely-balanced argument, defendant relies on *People v. Sebby*, 2017 IL 119445.

In *Sebby*, the defendant was charged with felony resisting a peace officer. *Id.* ¶ 1. That charge required the State to prove in part that the defendant knowingly resisted a peace officer and that his resistance was the proximate cause of an injury to that officer. 720 ILCS 5/31-1(a-7) (West 2010). On the resistance element, the three responding officers testified that the defendant resisted. *Sebby*, 2017 IL 119445, ¶¶ 55-56. Three other witnesses, including the defendant, testified that the defendant did not resist but was instead being yanked around by the officers. *Id.* ¶¶ 57-58.

¶ 77    The *Sebby* court concluded that the evidence was closely balanced. *Id.* ¶ 61. The court observed that the State's witnesses provided accounts that were consistent with each other, as did the defendant's witnesses. *Id.* Neither party's version of the events was fanciful. *Id.* The court rejected the State's argument that the testimony of the defendant's witnesses was less plausible because those witnesses were relatives or friends of the defendant and might be biased. *Id.* ¶ 62. The court also noted that neither party's version of the events was corroborated by extrinsic evidence. *Id.* The court found that, as in *People v. Naylor*, 229 Ill. 2d 584 (2008), the outcome of the trial depended on a " 'contest of credibility' " between the officers and the defendant and his witnesses. *Sebby*, 2017 IL 119445, ¶ 63 (quoting *Naylor*, 229 Ill. 2d at 606-07). The court explained that, because the outcome depended on a choice between two versions which were both credible, the evidence was closely balanced. *Id.* (citing *Naylor*, 229 Ill. 2d at 608).

¶ 78    In contrast, evidence has been deemed to be not closely balanced when one witness's version of events was either implausible or corroborated by other witnesses. See, *e.g.*, *People v. Daniel*, 2018 IL App (2d) 160018, ¶ 30. Additionally, courts have found no "credibility contest" when one party's version of the events was either implausible or corroborated by other evidence. See, *e.g.*, *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 12 (circumstantial evidence supported

the victim's version of events and the defense presented no evidence); *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (evidence not closely balanced where circumstantial evidence supported State's witnesses' testimony while the defendant's entire version of events "strained credulity"); *People v. Anderson*, 407 Ill. App. 3d 662, 672 (2011) (evidence not closely balanced where the defendant's version of events was implausible).

¶ 79    We find the evidence in this case was not closely balanced as B.C.'s version of events was corroborated by the State's evidence and defendant's version of events strained credulity. B.C. testified defendant entered her residence at 4:20 a.m., held a knife to her neck, and sexually assaulted her.  Nurse Joseph testified that upon examining B.C. she discovered a 3-centimeter long abrasion under her chin.  This testimony corroborates B.C.'s testimony that defendant threatened her by holding a knife to her neck.  In addition, Nurse Joseph testified that she took swabs of B.C.'s breast and anus.  Kell, a forensic scientist, opined that the breast swab matched defendant's DNA and would be expected to occur in approximately one in 1.2 sextillion African Americans, one in 140 quintillion Caucasians, or one in 870 quintillion Hispanic unrelated individuals.  While no DNA was suitable for comparison from the anal swab, forensic DNA analyst Dr. Garinger testified that the anal swab contained a partial mixture of human DNA profiles from at least two individuals, which serves to provide some corroboration of B.C.'s testimony that defendant placed his tongue in her anus.  We also observe that B.C.'s version of events was further corroborated by her immediate and consistent outcries to 911, Officer Mazintas, and Nurse Joseph.  Accordingly, the physical evidence and the testimonies of Officer Mazintas and Nurse Joseph serve to tip the balance in favor of B.C.'s account of events.  See *People v. Hernandez-Valdez*, 260 Ill. App. 3d 644, 647 (1994) (evidence not closely balanced where State's witnesses were highly credible and the defendant's testimony was unbelievable).

¶ 80    Defendant maintains, however, that the breast swab fails to tip the balance of the evidence where he testified that he kissed B.C.'s breast with her consent and that explains the presence of his DNA on B.C.'s body.  Unlike the *Sebby* court, we cannot say that defendant's account of events was not fanciful.  Defendant testified that he went to B.C.'s residence in the early morning hours with a woman named Maria.  According to defendant, Maria let herself into B.C.'s apartment and then they both smoked crack with B.C.  Defendant testified that, after smoking crack all night, he left the drug house to go to B.C.'s apartment.  Indeed, no evidence was presented that established B.C. had smoked crack or that crack was discovered in B.C.'s residence.  It seems illogical that defendant and Maria would go to B.C.'s residence to smoke crack if B.C. was not in possession of crack.  Defendant further testified that Maria left to obtain more crack; however, he also testified that he was actually in possession of crack at that time and he, in fact, suggested B.C. engage in sexual acts in exchange for crack.  This demonstrates the fanciful nature of defendant's testimony as it does not follow that Maria would leave the apartment to obtain crack if defendant was still in possession of some crack.

¶ 81    Another inconsistency in defendant's testimony was that he testified he engaged in sexual contact with B.C. for 10 minutes, yet on cross-examination testified they engaged in "just" a kiss.  Defendant's testimony further strained credulity in that he simultaneously testified he is not sexually aroused while he is on crack, but also testified he was the one who suggested the exchange of sex for drugs and then, "because the opportunity presented itself[,]" began kissing B.C.'s breast for 10 minutes and "sarcastically" slapped her buttocks.  The fact defendant denied kissing B.C.'s breast because he was sexually aroused contradicts his behavior of engaging in sexual relations with B.C. for 10 minutes.  Moreover, unlike B.C.'s testimony, defendant's testimony lacked consistent and corroborating evidence.

¶ 82    Additionally, even if it were error to admit M.M.'s testimony to demonstrate propensity under section 115-7.3, as previously discussed, the other-crimes evidence proved defendant's intent, as well as the absence of innocent frame of mind and lack of consent. See *People v. Eubanks*, 2021 IL App (1st) 182549, ¶ 72 (finding the other-crimes evidence assisted in rendering the evidence not closely balanced). The evidence in this case is not closely balanced and the other-crimes evidence was legitimately admitted for purposes of showing intent and lack of consent. See *People v. Harris*, 297 Ill. App. 3d 1073, 1086 (1998) (other-crimes evidence was relevant to prove defendant's criminal intent where defendant used a consent as a defense). At trial, J.C. and M.M. testified in detail about defendant's criminal conduct against them. Even though the trial court did not admit the other-crimes evidence for *modus operandi*, the details of J.C. and M.M.'s assaults were strikingly similar to what happened to B.C. For example, J.C. and M.M. testified defendant entered their residences uninvited in the early morning hours and threatened to kill them if they did not obey his commands. Similarly, defendant entered B.C.'s residence uninvited at 4:20 a.m., held a knife to her throat, and threatened harm to her and her son if she did not do as he said. In addition, J.C. testified defendant twice used a weapon to force her to engage in sexual acts—first employing a screwdriver and then later a knife. B.C. also testified defendant used a knife in the attack. The attack against J.C. was also similar to B.C.'s in that in both offenses defendant stole money or objects from their residences. While he did not admit to the details of the offenses, more importantly, defendant testified that he pled guilty to the offenses against M.M. and J.C. These similar acts against M.M. and J.C. establish defendant's intent and a lack of consent by the victims in each case. See *id.*

¶ 83    In conclusion, the outcome in *Sebby* turned on a "contest of credibility," involving conflicting accounts of the circumstances of the defendant's arrest from the deputies involved

and the defendant, as well as from several witnesses who were present. *Id.* ¶ 63. As no extrinsic evidence was offered in *Sebby* to corroborate or contradict either version of the conflicting accounts and both versions were credible, our supreme court found that the defendant had satisfied his burden to demonstrate that the evidence was closely balanced. *Id.* (citing *Naylor*, 229 Ill. 2d at 607-08). This is not the case here where, even excluding the other-crimes evidence, the State presented evidence corroborating B.C.'s testimony and defendant's version of events is fanciful and contradicted by his own testimony. See *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 35-36 (finding no credibility contest when one party's version of the events either was corroborated by other evidence or was implausible); see also *Hernandez-Valdez*, 260 Ill. App. 3d at 647. Additionally, the erroneous admission of other-crimes evidence warrants reversal only where the evidence was "a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different[.]" *People v. Hall*, 194 Ill. 2d 305, 339 (2000). We cannot say, based on the evidence presented in this case, that M.M.'s testimony being admitted for propensity can be regarded as being such a material factor in defendant's conviction where the jury was presented with, not only B.C.'s credible testimony, but also the corroborating evidence of her outcries to police and medical staff, as well as the DNA and physical evidence, and the other-crimes evidence admitted through J.C.'s testimony. The evidence in this case is not "so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Wilmington*, 2013 IL 112938, ¶ 31. Accordingly, we conclude that no plain error occurred.

¶ 84                    Claimed Error in Admitting B.C.'s Prior Statements

¶ 85    Defendant next raises a series of arguments that the trial court abused its discretion when it allowed certain prior consistent statements made by B.C. to be heard by the jury. According to

defendant, these statements served only to bolster B.C.'s in-court testimony and therefore prejudiced him.

¶ 86    The admission of evidence is within the sound discretion of the trial court, and its ruling will not be disturbed unless there was an abuse of discretion. *People v. Beard*, 273 Ill. App. 3d 135, 142 (1995). A trial court abuses its discretion where its decision to admit evidence is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position. *People v. Ruback*, 2013 IL App (3d) 110256, ¶ 24.

¶ 87    The general rule is that prior consistent statements of a witness are inadmissible for the purpose of corroborating the witness' trial testimony because they serve to unfairly enhance the credibility of the witness. *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 52. The reason behind this rule has been explained as follows: "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985). There are two distinct exceptions to this rule: (1) where the prior consistent statement rebuts a charge that a witness is motivated to testify falsely, and (2) where the prior consistent statement rebuts an allegation of recent fabrication. *People v. Richardson*, 348 Ill. App. 3d 796, 802 (2004). Under the first exception, the prior consistent statement is admissible if it was made before the motive to testify falsely came into existence. *Id.* Under the second exception, a prior consistent statement is admissible if it was made prior to the alleged fabrication. *Id.* A reviewing court will not reverse a trial court's evidentiary ruling on a prior consistent statement absent an abuse of discretion. *Id.* at 801. Based on the record provided, we find the trial court did not abuse its discretion.

¶ 88                                    *911 Recording*

¶ 89    Defendant asserts that the publication of B.C.'s call to 911 was improperly admitted where it served only to bolster her in-court testimony and it did not fall within the excited utterance exception to hearsay.  The State observes that this issue has been forfeited where defendant failed to object on this basis during the trial.  Furthermore, aside from any forfeiture, the State argues that the 911 recording was admissible to rebut defendant's defense of consent and for the nonhearsay purpose of setting forth the inception of the criminal investigation.

¶ 90    We initially find this issue is forfeited.  See *People v. Watt*, 2013 IL App (2d) 120183, ¶ 44.  At trial, defendant objected to the admission of the 911 call based on the lack of foundation only.  Defendant did not raise the additional objection he now urges on appeal, that the prior consistent statement was hearsay.  On review, a defendant cannot change or add to the basis of his objection in the appellate court.  *People v. McClendon*, 197 Ill. App. 3d 472, 482 (1990).  A specific objection at trial eliminates all grounds not specified.  *Id.*  Despite defendant's forfeiture of this issue, we will review it under the plain-error doctrine.

¶ 91    As previously stated, the plain-error doctrine allows a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.  *Piatkowski*, 225 Ill. 2d at 565. Defendant bears the burden of persuasion regarding whether the evidence was closely balanced or whether the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process.  *Herron*, 215 Ill. 2d at 178.  In order for there to be plain error,

we must first find error. *Piatkowski*, 225 Ill. 2d at 565.

¶ 92　　A prior consistent statement that meets the requirements for admission as an excited utterance, sometimes called a spontaneous declaration, is admissible as an exception to the hearsay rule. *People v. Davis*, 130 Ill. App. 3d 41, 55-56 (1984). Illinois Rule of Evidence 803(2) (eff. Apr. 26, 2012), excludes from the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." For the excited utterance exception to apply, "(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) there must be an absence of time for the declarant to fabricate the statement; and (3) the statement must relate to the circumstances of the occurrence." *People v. Williams*, 193 Ill. 2d 306, 352 (2000)). "The trial court has discretion to determine whether statements are hearsay and, if so, whether admissible under an exception," and we will only reverse a trial court's hearsay ruling for an abuse of discretion. *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 43.

¶ 93　　In determining whether a hearsay statement is admissible under the spontaneous declaration exception, courts employ a totality of the circumstances analysis, which includes several factors: the nature of the event, passage of time, the mental and physical condition of the declarant, and the presence or absence of self-interest. *Id.* While the period of time that may pass without affecting the admissibility of a statement varies greatly, a statement made when the excitement of the occurrence no longer predominates is inadmissible hearsay. See *People v. Sutton*, 233 Ill. 2d 89, 107-08 (2009); *People v. House*, 141 Ill. 2d 323, 382 (1990) (citing 6 John H. Wigmore, Evidence in Trials at Common Law § 1747, at 195 (Chadbourn rev. ed. 1976) (statements "made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by

reasoned reflection" qualify for nonhearsay treatment)).

¶ 94   Undoubtedly, a sexual assault would qualify as a sufficiently startling occurrence for purposes of the excited utterance exception.  Defendant concedes that a sexual assault is a startling event and that B.C.'s testimony related to the circumstances of the sexual assault but argues that the passage of time was too long to qualify for the exception.  Our courts, however, have recognized that the period of time which may have passed without affecting the admissibility of a statement under the spontaneous declaration exception varies greatly.  See *People v. Williams*, 193 Ill. 2d 306, 353 (2000).  Sometimes many hours will pass, and the statement will be admissible and sometimes mere minutes will pass and the statement will be inadmissible.  *Id.*  In addition, our supreme court has observed that "a declarant may make a spontaneous declaration to a person even after having spoken previously to another."  *Williams*, 193 Ill. 2d at 353 (citing *House*, 141 Ill. 2d at 386).  Therefore, we look to the circumstances surrounding the statement to determine whether it was or was not an excited utterance.  See *Dobbey*, 2011 IL App (1st) 091518, ¶ 43.

¶ 95   We find that B.C.'s statement to the 911 operator was sufficiently prompt to permit admission as an excited utterance.  B.C.'s testimony established that immediately after defendant exited her residence, she checked on her 3-year-old child, called her boyfriend, and then called 911.  There was no testimony elicited by either party regarding the length of time between the sexual assault and when B.C. called 911.  A review of the 911 recording reveals that B.C. was crying on the phone to the operator and her voice was strained.  While B.C. regained some composure to respond to the operator's inquiries, at the end of the call when she recalled what defendant said to her, B.C. commenced crying again.  In addition, B.C. testified on cross-examination that she was still in shock over the sexual assault when she was being treated at the

hospital. Based on the totality of the circumstances, we find that B.C.'s statement to the 911 operator was spontaneous and, therefore, we cannot say that the trial court abused its discretion in admitting the 911 recording as an exception to the hearsay rule. See *Watt*, 2013 IL App (2d) 120183, ¶ 43.

¶ 96                                                    *Officer Mazintas*

¶ 97    Defendant also argues that the trial court abused its discretion when it allowed Officer Mazintas to testify regarding B.C.'s statements to him where her statements did not qualify under the excited utterance exception to the hearsay rule due to the length of time that transpired before making it. Defendant maintains that B.C. had "plenty of time for self-reflection" and that during this time she could have fabricated a motive to lie about the sexual assault.

¶ 98    The State maintains that the trial court properly admitted this testimony as an excited utterance. The State points to Officer Mazintas' testimony wherein he described B.C.'s demeanor as "a little distraught, a little scared, a little flustered" before she explained what happened during the offense and provided a description of her attacker. In the alternative, the State argues that B.C.'s statement to Officer Mazintas was also admissible to explain the inception of the investigation and, since B.C. provided a description of defendant to the police, would assist the jury in understanding how they came to identify defendant as a suspect.

¶ 99    For the reasons previously stated, we find that B.C.'s statement to Officer Mazintas was properly admitted as an excited utterance. The offense occurred at 4:20 a.m. Officer Mazintas testified he arrived at B.C.'s residence at 5 a.m. Regarding B.C.'s demeanor he testified she was "a little distraught, a little scared, a little flustered." B.C. testified she was "in shock" when she was being treated at the hospital. Based on the totality of the circumstances, we cannot say that the trial court abused its discretion when it admitted this evidence under the excited utterance

exception.  See *People v. Gacho*, 122 Ill. 2d 221, 241-42 (1988) (finding that, under the facts and circumstances, a statement made six-and-a-half hours after the offense qualified as an excited utterance); *People v. Sutton*, 233 Ill. 2d 89, 108-09 (2009) (finding the victim's statements at the scene and in the ambulance were admissible under the excited utterance exception).

¶ 100                                                                *Nurse Joseph*

¶ 101   Defendant further asserts that the trial court abused its discretion when it allowed the State to admit into evidence the statement which B.C. provided to nurse Joseph.  While defendant admits that this statement arguably fell within the hearsay exception for statements provided to medical personnel (see 725 ILCS 5/115-13 (West 2012)), he maintains that it was not reasonably pertinent to B.C.'s diagnosis or treatment.

¶ 102   Section 115-13 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115-13 (West 2012)), provides that "statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule."  It is readily apparent that B.C.'s statement to nurse Joseph falls under this exception. B.C.'s description of the sexual assault to Joseph was presented in the context of describing the treatment which she received at the hospital, which included a sexual assault kit being collected. Thus, section 115-13 clearly applied to the statement made to the nurse.  See *People v. Monroe*, 366 Ill. App. 3d 1080, 1093 (2006).  Indeed, defendant acknowledges as much in his reply, but maintains that this statement was cumulative of other evidence and the prejudice from its admission outweighs the probative value.  We, however, find this argument unpersuasive.

¶ 103                                    *Cumulative Error*

¶ 104   Defendant urges this court to consider the cumulative effect of all three of the statements

and find that their admission was unduly prejudicial.  Defendant maintains that the effect of

allowing all three of these statements to be presented to the jury created a risk that the jury would

believe B.C.'s account of the offense solely because it was repeated.  Defendant asserts that the

effect is especially dangerous in this case because the evidence amounted to a credibility contest.

¶ 105   We initially observe that defendant did not raise this issue before the trial court and raises

no plain-error argument on appeal.  As stated previously, under such circumstances we find

defendant's argument to be forfeited.  See *People v. Hall*, 194 Ill. 2d 305, 351 (2000) (declining

to consider forfeited errors that did not individually rise to the level of plain error when

conducting their cumulative error analysis); *People v. Caffey*, 205 Ill. 2d 52, 118 (2001) (same).

In addition, we note that generally there is no cumulative error where the alleged errors do not

amount to any reversible error on any individual issue.  *People v. Doyle*, 328 Ill. App. 3d 1, 15

(2002) (citing *People v. Falconer*, 282 Ill. App. 3d 785, 793 (1996)).  See *Caffey*, 205 Ill. 2d at

118 (where no error occurred at all, or any error that may have occurred did not rise to the level

of plain error, the defendant was not entitled to a new trial based on cumulative error).  As we

find that the trial court did not err in its admission of this evidence, there can be no cumulative

error.

¶ 106                                    Jury Instructions

¶ 107   Defendant raises two arguments regarding the propriety of the jury instructions: (1) that

the jury was provided with contradictory instructions resulting in reversible error; and (2) the

trial court erred when it failed to provide a lesser included offense instruction for theft.  We

address each issue in turn.

¶ 108                              *Contradictory Instructions*

¶ 109   Defendant argues that he was denied his right to a fair trial where the trial court provided

contradictory instructions to the jury regarding the other crimes evidence.  Specifically,

defendant asserts that although the trial court explained that evidence of defendant's prior

residential burglary conviction could be considered only for how it affected his believability as a

witness, it also instructed the jury that evidence he was involved in prior offenses could be

considered on the issues of motive, intent, lack of consent, and propensity.  Thus, the jury was

not apprised that defendant's residential burglary conviction was admitted only for impeachment.

¶ 110   The State argues that defendant failed to preserve this argument for our review by failing

to raise the issue before the trial court during the jury instruction conference and again in his

posttrial motion.  The State further asserts that even if there was error in the jury instructions, the

evidence was not closely balanced where the jury properly received the other crimes evidence

against M.M. and J.C. and the prosecutor explained in closing argument that this evidence was

received for the proper purposes.

¶ 111   Our supreme court has found that a defendant will be considered to have forfeited his

right for review of a jury instruction error if he failed to object to the instruction at trial and did

not raise the issue in a posttrial motion.  *People v. Sargent*, 239 Ill. 2d 166, 188-89 (2010).

Although defense counsel failed to raise the issue that the jury instructions did not identify the

offense for which they were intended and failed to include the alleged error in his posttrial

motion, Illinois Supreme Court Rule 451(c) (eff. July 1, 2006) states that substantial defects in a

criminal jury instruction "are not waived by failure to make timely objections thereto if the

interests of justice require."  This rule is meant to correct grave or serious errors and errors in

cases so factually close that fundamental fairness requires that the jury be properly instructed.

*Sargent*, 239 Ill. 2d at 189.  The rule is coextensive with the plain-error clause of Illinois Supreme Court Rule 615(a), which provides: " 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.  Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' "  *Id.* (quoting Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)).  As always, the first step of plain-error review is to determine if any error occurred.  *Piatkowski*, 225 Ill. 2d at 565.

¶ 112   In this case, the trial court provided Illinois Pattern Jury Instruction Nos. 3.13 and 3.14 to the jury.  Instruction No. 3.13 provided as follows:

"Evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

Instruction No. 3.14 stated:

"Evidence has been received that the defendant has been involved in offenses other than those charged in the indictment.  This evidence has been received on the issues of defendant's motive, intent, lack of consent, and propensity, and may be considered by you only for those limited purposes.

It is for you to determine whether the defendant was involved in those offenses and, if so, what weight should be given to this evidence on the issues of motive, intent, lack of consent, and propensity."

As noted by defendant, neither of these instructions indicated to which convictions and offenses they referred.  In addition to these instructions, the trial court also provided the instruction that, "Any evidence that was received for a limited purpose should not be considered by you for any other purpose."

¶ 113   Here, the prosecutor, in closing argument, addressed the other-crimes instruction. The prosecutor specifically advised the jury that the testimony from M.M. and J.C. could only be considered "on the issues of the defendant's motive, intent, lack of consent, and propensity, and may be considered by you only for those limited purposes." The prosecutor further informed the jury that it was for them "to determine whether the defendant was involved in those offenses and, if so, what weight should be given to this evidence." The prosecutor also repeated this proposition in rebuttal argument and expressly stated that this proposition applied to "certain cases, like sexual assault." Importantly, defense counsel also addressed the other-crimes evidence and similarly explained its limited use to the jury and acknowledged that the prosecutor "explained the facts and circumstances that go with this." We observe that this court has stated that "the failure to give instructions to which a defendant is entitled but does not request will not rise to plain error when the total instructions to the jury together with arguments of counsel apprise them of the missing element." *People v. McCreary*, 123 Ill. App. 3d 880, 883 (1984). In this instance, it is evident that the jury was properly instructed regarding the application of the other crimes evidence instruction. See *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 127 ("The closing arguments of the parties are also instrumental in forming a jury's understanding of the law and can compensate for confusing aspects of the instructions.").

¶ 114   Regarding instruction No. 3.13, the prior conviction instruction, neither the prosecutor nor defense counsel discussed this in their closing arguments. However, when considering the jury instructions as a whole, it is apparent that a reasonable juror would surmise that instruction No. 3.13 refers to the residential burglary conviction. This is particularly true where the jury was aware that the crimes involving M.M. and J.C. were to be used for limited purposes as explained by the prosecutor and laid out in instruction No. 3.14; accordingly, the only conviction remaining

for the jury to consider under instruction No. 3.13 was the residential burglary conviction. See

*People v. Brandon*, 283 Ill. App. 3d 358, 364 (1996) ("Error in jury instructions is harmless

where the instructions, taken as a whole, correctly and fully instruct the jury.").

¶ 115                              *Lesser Included Offense*

¶ 116   Defendant also argues that his conviction for armed robbery should be vacated where the

trial court improperly refused to instruct the jury about the lesser included offense of theft.

Defendant contends that the failure to provide this instruction was in error because his testimony

established that B.C. gave him money so he could purchase crack cocaine and that he neither

purchased the crack cocaine nor gave B.C. her money back. According to defendant, this

amounts to "some evidence" from which to conclude that he stole B.C.'s money and did not do

so using force.

¶ 117   The State responds that defendant was not entitled to a theft instruction where he failed to

present any evidence that he intended to permanently deprive B.C. of her money, a necessary

element of theft.

¶ 118   A defendant is entitled to a lesser included offense instruction only if the evidence at trial

is such that a jury could rationally find the defendant guilty of the lesser offense yet acquit him

of the greater. *People v. Medina*, 221 Ill. 2d 394, 405 (2006). In Illinois, courts apply the

charging instrument approach when determining whether an offense qualifies as a lesser-

included offense. *People v. Kennebrew*, 2013 IL 113998, ¶ 41. Under this approach, "the lesser

offense need not be a 'necessary' part of the greater offense, but the facts alleged in the charging

instrument must contain a 'broad foundation' or 'main outline' of the lesser offense." *Id.* ¶ 30.

The charging instrument approach requires a two-step analysis. *Id.* First, we determine whether

an offense is a lesser-included offense. *Id.* Then, we examine the evidence at trial to determine

"whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." (Emphasis in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. Whether an offense is a lesser included offense of a charged crime is an issue of law that we review *de novo. Kennebrew*, 2013 IL 113998, ¶ 18; *People v. Kolton*, 219 Ill. 2d 353, 361 (2006).

¶ 119 "[T]he second step—examining the evidence adduced at trial—should not be undertaken unless and until it is first decided that the uncharged offense is a lesser-included offense of a charged crime." *Kolton*, 219 Ill. 2d at 361. "When the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *McDonald*, 2016 IL 118882, ¶ 42. "Common sense dictates that, for a reviewing court to determine whether the trial court abused its discretion, it must undertake a review of the relevant evidence. This is necessary because an abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *Id.* ¶ 32.

¶ 120 A person commits armed robbery when he takes property from the person or presence of another using force or by threatening the imminent use of force while he is presently armed with a dangerous weapon. 720 ILCS 5/18-1(a)(1) (West 2012).

¶ 121 Our supreme court has found that theft can be a lesser included offense of armed robbery where the conduct and the mental states required for theft are alleged in the armed robbery indictment. *People v. Jones*, 149 Ill. 2d 288, 295 (1992). Here, defendant's indictment for armed robbery provided that defendant "knowingly took property, to wit: a laptop and U.S. Currency, from the person or presence of [B.C.] by the use of force or by threatening the imminent use of force" and that defendant was armed with a knife. In order to sustain a

conviction of theft, the State must establish that the defendant knowingly "obtain[ed] or exert[ed] unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(1) (West 2012). This indictment for armed robbery contained the elements of theft, namely, knowingly obtaining or exerting unauthorized control over B.C.'s property. Therefore, we find theft to be a lesser included offense of armed robbery as charged in this case.

¶ 122    Turning to the second step, a defendant is entitled to the lesser included offense instruction if there is any evidence tending to prove the defendant was guilty of the lesser offense rather than the greater, even if that evidence is very slight. *People v. Garcia*, 188 Ill. 2d 265, 284 (1999). Here, B.C.'s testimony indicated that while armed with a knife, which he had held to her neck during the sexual assault, defendant took B.C.'s laptop, money, and cigarettes. Defendant's testimony, however, sharply contradicted B.C.'s version of the events. Defendant denied that he ever had a knife and denied that he used force or the threat of force against B.C. Instead, defendant maintained that B.C. gave him money to purchase drugs. While defendant did admit that he did not purchase the drugs nor did he return the money to B.C., he failed to present any evidence that he obtained or exerted unauthorized control over B.C.'s money. He also failed to present any evidence regarding the laptop.

¶ 123    Even if we were to consider it an error for the trial court not to have provided the theft instruction, it is evident that the jury would not reasonably have convicted defendant of theft given the evidence. See *People v. Jones*, 81 Ill. 2d 1, 9 (1979) (" 'Even though error may have been committed in giving or refusing to give an instruction, it will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty.' "). Where the evidence is sufficient to convict a defendant of the greater offense, it is not reversible error to instruct the jury only as to that

offense. *People v. Fonville*, 158 Ill. App. 3d 676, 685 (1987).

¶ 124  The distinguishing element among armed robbery, robbery, and theft is whether force or the threat of force, or a dangerous weapon is employed. See, *e.g., Jones*, 149 Ill. 2d at 296 (discussing elements that distinguish armed robbery and robbery from theft). Stated another way, theft is a simple deprivation of property; robbery is a deprivation of property, plus force or the threat of force; and armed robbery is the deprivation of property, plus force or the threat of force, plus the use of a dangerous weapon. 720 ILCS 5/16-1(a)(1) (West 2012); 720 ILCS 5/18-1(a) (West 2012); 720 ILCS 5/18-2(a) (West 2012).

¶ 125  Here, the jury was presented with the option of finding defendant guilty of armed robbery and ultimately the jury found him guilty of that offense. This means that the jury did not believe defendant's version of the incident but, rather, believed the testimony of B.C. and Officer Mazintas, and found that defendant employed a dangerous weapon and the use of force or the threat of force to deprive B.C. of her property. As the jury found that the State had proven those two elements, it would not have returned a conviction of theft instead of armed robbery if it were presented with that option. Therefore, we find that if there was error in the trial court's refusal to instruct the jury on theft it was harmless error. See *People v. Washington*, 375 Ill. App. 3d 243, 248 (2007); see, *e.g., Fonville*, 158 Ill. App. 3d at 687 (finding that any error in refusing to instruct the jury on the lesser included offense of possession of a controlled substance was harmless where the evidence was sufficient to show the greater offense of possession with intent to manufacture or deliver a controlled substance).

¶ 126                          Prosecutorial Misconduct

¶ 127  Lastly, defendant argues numerous errors made during the State's closing and rebuttal arguments prejudiced him and require the reversal of this case and a remand for a new trial. We

initially observe that defendant properly preserved some of these claims for our review but failed to preserve others. Accordingly, the plain-error doctrine applies to some, but not all, of defendant's alleged errors. Yet, as always, the first step in a plain-error analysis is to determine if any error occurred. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 128 Generally, a prosecutor is given wide latitude in closing arguments, although his or her comments must be based on the facts in evidence or upon reasonable inferences drawn therefrom. *People v. Page*, 156 Ill. 2d 258, 276 (1993). "The prosecutor has the right to comment on the evidence and to draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant." *People v. Simms*, 192 Ill. 2d 348, 396 (2000). "Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial." *Id.* "In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). "Prosecutorial misconduct warrants reversal only if it 'caused substantial prejudice to the defendant, taking into account the content and context of the comment[s], its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.' " *People v. Love*, 377 Ill. App. 3d 306, 313 (2007) (quoting *People v. Johnson,* 208 Ill. 2d 53, 115 (2004)). "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123.

¶ 129 This court has "noted confusion regarding the appropriate standard of review regarding

alleged errors occurring during closing arguments." *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39. Such confusion "originates from our supreme court's apparent conflicting holdings" in *Wheeler* (applying *de novo* standard), and *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (employing an abuse of discretion standard). *Johnson*, 2015 IL App (1st) 123249, ¶ 39. We need not resolve the issue, however, because we reach the same conclusion under either standard.

¶ 130    Defendant first claims that the prosecutor made "disparaging and dehumanizing remarks" about him which were designed to prejudice the jury against him. Specifically, defendant maintains the prosecutor repeatedly described defendant's conduct as "sickening," "disgusting," "horrible," "vicious," and that he was "pure evil." Defendant further asserts that the prosecutor inappropriately compared him to a snake when she used the word "slithering" to describe him coming into B.C.'s apartment while she was sleeping.

¶ 131    We first address the prosecutor's comment that involved the word "slithering." The prosecutor stated as follows, "Ladies and gentlemen, [B.C.] had no idea when she went to sleep that night, the absolute sickening crimes that the defendant would inflict on her. But you now know. You now know what he did to her that night in her apartment, where she's supposed to feel safe in her own bedroom; that while [B.C.] was sleeping, that defendant was slithering into her apartment." Defense counsel immediately objected (without stating a basis for the objection) and the trial court sustained the objection "as to slithering" and struck it from the record. We find the immediate objection and the sustaining of that objection (along with the fact it was stricken from the record) cured any prejudice from a potentially improper argument. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 92.

¶ 132    Defendant claims that the use of the words "sickening," "disgusting," "horrible,"

"vicious," and "pure evil," was an attempt to inflame the passions of the jury. We do not find this argument persuasive. We again observe that prosecutors are afforded a great deal of latitude in closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. They may comment on the evidence and draw reasonable inferences therefrom, as well as dwelling on the " 'evil results of crime' " and urging the " 'fearless administration of the law.' " *People v. Liner*, 356 Ill. App. 3d 284, 295-96, 297 (2005) (quoting *People v. Harris*, 129 Ill. 2d 123, 159 (1989)). However, a prosecutor may not make an argument that serves no purpose but to inflame the jury. *Blue*, 189 Ill. 2d at 128.

¶ 133   Defendant takes issue on appeal with the following remarks:

- "Ladies and gentlemen, [B.C.] had no idea when she went to sleep that night, the absolute *sickening* crimes that the defendant would inflict on her." (Emphasis added.)

- "He dug that knife into her throat, as she was whimpering and resisting his *sickening* actions." (Emphasis added.)

- "Of course, you heard he took the $23 or $24 that [B.C.] had in her wallet. He took that with him after what he did to her, after the *sickening* actions that he did to her ***." (Emphasis added.)

- "That is why he was in that apartment to do all of the *disgusting* things that he did to [B.C.]." (Emphasis added.)

- "She [B.C.] pointed him out to you and said, He's the man that did these *horrible* things to me. Not only did she point him out in front of you, she had pointed him out earlier in a lineup procedure as the man who had brutalized her on September 26, 2013. And his DNA that he left in his saliva, in his spit that he had left on her breast, told you it was that [*sic*] defendant who committed these *vicious* acts against [B.C.]

on September 26, 2013." (Emphases added.)

- "Then you heard the testimony from [J.C.]. The only thing worse than getting raped in your own house in the middle of the night by a stranger is it happening twice. That is *pure evil*." (Emphasis added.)

¶ 134 We note that defendant properly preserved objections to some of these words and failed to object to others. Despite this inconsistency, we agree with the State that the prosecutor was not calling *defendant* sickening, disgusting, horrible, vicious, or evil, but instead was referring to the offense as such. "[C]ommenting unfavorably on the evils of crime do[es] not constitute error." *Blue*, 189 Ill. 2d at 129 (citing *People v. Hope*, 116 Ill. 2d 265, 277-78 (1986)). Here, defendant was on trial for various acts of rape after breaking into B.C.'s residence in the middle of the night. It was permissible for the State to comment on the nature of that crime. Accordingly, we find no error.

¶ 135 Defendant next claims that the prosecutor inappropriately stated certain evidence was uncontradicted when it, in fact, was not. Specifically, defendant maintains that the prosecutor stated there was "no question" that defendant had a knife during the encounter even though he denied having a knife and "no question" that he committed the offense of aggravated criminal sexual assault despite defendant testifying that B.C. gave her consent for him to touch her breast. Defendant further maintains that the prosecutor inappropriately rhetorically asked the jury, "Is there really any question?" that force was used during the offense. Finally, defendant notes that the prosecutor improperly asserted that there was "no question about it" that defendant committed all six counts against him as charged.

¶ 136 During closing argument, when describing the conduct required to support the charges for aggravated criminal sexual abuse, the prosecutor stated, "And she told you here this week all

of the degrading ways that the defendant took her. That the act was committed by the use of force or threat of force and that [B.C.] did not consent to the act of sexual penetration. *Is there really any question?*" (Emphasis added.) Defense counsel then objected, and the trial court overruled the objection. Defendant included this comment in his posttrial motion. Later, the prosecutor stated, "How do you know that the defendant put his mouth on her breast? He left his saliva there. His DNA was on her right breast. *There's no question.*" (Emphasis added.) Defense counsel did not object. Later, the prosecutor stated, defendant "committed the home invasion of [B.C.], committed the armed robbery of [B.C.], committed the three counts of aggravated criminal sexual abuse against [B.C.]. *There's no question about it.*" (Emphasis added.) Defense counsel objected, and the trial court overruled the objection. Defendant asserted a general argument regarding these comments in his posttrial motion.

¶ 137   We find no prejudicial error in the prosecutor's comments. While we acknowledge that a prosecutor should refrain from misstating the evidence (see *People v. Johnson*, 149 Ill. App. 3d 465, 468 (1986)), it is evident from context that the prosecutor here was commenting on the strength of the State's case. See *People v. Moore*, 171 Ill. 2d 74, 105-07 (1996). Moreover, the trial court instructed the jury prior to closing arguments that it was to disregard any comments made by counsel that did not reflect what was in evidence and that their arguments were not evidence in the case. See *People v. Simms*, 192 Ill. 2d 348, 396 (2000). Accordingly, these statements did not affect the fairness of defendant's trial nor did they challenge the integrity of the judicial process as these comments were supported by the evidence.

¶ 138   Defendant also argues that the prosecutor "repeatedly emphasized" the ages of J.C. and M.M. during closing arguments for no other purpose than to inflame the passions of the jury. Additionally, defendant argues that the prosecutor referred to defendant as "every mother's worst

nightmare" and that he's "what goes bump in the night" for the same purpose.

¶ 139    The statements at issue are as follows:

"What that defendant did to [J.C.] and [M.M.] when you're determining whether he did it to [B.C.]  And make no mistake about it, with [J.C.], he again crept into her house on August 1st of 1987, got near her sleeping body, put a knife to her throat, sound familiar, and assaulted her sexually.  He shoved his penis into [J.C.]'s 16-year-old vagina in 1987.

He was not satisfied with that.  Eight months later he came back and did the same thing to [J.C.] and taunted her afterwards, asking her if she had ever--pardon my language-- ever been F[***] before, taunting her after he raped her for the second time in eight months."

Defendant objected, and the trial court overruled the objection; however, defendant did not raise this claim in his posttrial motion.

¶ 140    The prosecutor continued:

"[M.M.] told you about the same night that he raped [J.C.] for the second time, [M.M.] told you that just about half an hour before he started raping [J.C.] on March 29th of 1988, and this defendant crept into [M.M.]'s apartment, 11-year-old M.M.'s apartment while she was asleep and started trying to sexually assault her,  making her strip in front of him.  And it was only [M.M.]'s quick thinking and by the grace of God that she bolted down that hallway when she only had her underwear on – left, after he had forced her to take her pants off and her T-shirt and her training bra and she was down to one item of clothing.  And 11-year-old [M.M.] ran as fast as she could down to her sister's room and woke her sister up, saying, there's a man in the apartment, there's a man in the apartment.

> And the sister had the sound of mind to get up immediately and run out and see what was going on and fight with that defendant—"

At this point, defendant objected without stating a basis for the objection and the trial court overruled the objection. This was not raised in defendant's posttrial motion.

¶ 141 In support of his argument that reference to J.C. and M.M.'s ages were improper, defendant cites *Liner*. We find this case to be inapposite. In *Liner*, the defendant argued on appeal that the prosecutor improperly emphasized the six-year-old victim's young age during closing argument to inflame the jurors' passions. *Liner*, 356 Ill. App. 3d at 296. Specifically, the prosecutor remarked that " '[t]hey stuck the gun in this little girl's face" and that the defendant threatened to kill the 'six-year-old little girl.' " *Id.* The prosecutor also remarked as follows:

> " 'Kayla Baker[-] when someone comes into her house in the winter time, the guy ought to be having a white beard and a bag of toys, not a .22[-]caliber revolver that he shoved into her face *** And now it's your job to convict him. And when you convict him, you make this whole county safe for all the Kayla Bakers that have a right to be asleep in their own home without having a guy like that come in and shove a gun in her face.
>
> * * *
>
> This county, and particularly little girls like Kayla Baker, have [*sic*] a right to be protected by their father when he can. And he almost died protecting her. *** She's got the right to be protected by the prosecutors ***. And she's got the right to be protected by the juries in Madison County. And when you find the Defendant guilty of Armed Robbery and Home Invasion, you're not just protecting Kayla Baker. You're protecting every child and every citizen in every home in this county.' " *Id.* at 296-97.

¶ 142   The reviewing court acknowledged that it is "entirely proper for the prosecutor to dwell upon the evil results of crime and to urge the fearless administration of the law," but made clear that "where 'the prosecutor blurs that distinction by an extended and general denunciation of society's ills and, in effect, challenges the jury to "send a message" by its verdict, he does more than urge "the fearless administration of justice," he interjects matters that have no real bearing upon the case at hand, and he seeks to incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation.' "  *Id.* at 297 (quoting *Harris*, 129 Ill. 2d at 159; *People v. Johnson*, 208 Ill. 2d 53, 79 (2003)).  Accordingly, the *Liner* court found that these comments during closing argument had no purpose other than to inflame the passions of the jury and were improper.  *Id.*  The court noted that "[b]y urging the jury to find the defendant guilty to 'make this whole county safe for all the Kayla Bakers' and to 'protect[] every child and every citizen in every home in this county,' the prosecutor improperly argued that Kayla was a member of a class with which we as a society, are sympathetic and that the defendant should be convicted because of the need to protect this class."  *Id.* at 297-98.  Ultimately, the court found that the prosecutor improperly challenged the jury to "send a message" by its verdict.  *Id.* at 298.

¶ 143   In contrast, the prosecutor's remarks in this case do not rise to this level.  The prosecutor mentioned the age of the victims, in part, to emphasize the similarities to the offense at hand— each of these prior offenses involved young females.  Moreover, we agree with the State that the prosecutor's remarks came in the context of summarizing the victims' testimony and the terror that they endured.  We thus find that these comments were properly made on the evidence presented at trial, keeping in mind the fact that prosecutors are granted wide latitude to comment on the evidence during argument.  See *Page*, 156 Ill. 2d at 276 (prosecutors may comment on the evidence and reasonable inferences drawn therefrom).

¶ 144    Next, defendant argues that the prosecutor "belittled" defendant's testimony while she vouched for the credibility of B.C.'s testimony, denying him a fair trial.  Defendant notes that the State described his testimony as "ridiculous," "preposterous," a "pack of lies," and a "big fat lie," while describing B.C.'s testimony as "credible," "truthful," and "extremely credible."

¶ 145    The State observes that defendant's own closing argument called the credibility of the State's witnesses into question and attempted to bolster defendant's own credibility; therefore, after defendant placed B.C.'s credibility at issue, the prosecutor made statements in rebuttal emphasizing the consistency of B.C.'s testimony.

¶ 146    In his closing argument, defense counsel attacked B.C.'s credibility in various ways. First, defense counsel noted that B.C. failed to inform the 911 operator that her laptop was taken. In addition, defense counsel stressed that B.C. lied to nurse Joseph regarding her drug use and that she was a smoker:

> "[T]hey want you to believe 100 percent what [B.C.] says, but she didn't tell the truth.
> She is a smoker.  She had those cigarettes.  She is a drug user.  She told you that she got
> high.  Her version of the facts have been impeached by her own admissions, that she was
> not what she told people at the hospital.  She wasn't drug free.  She wasn't tobacco free."

Defense counsel further argued that while B.C. stated she was "very fastidious" in that "[w]hen it was time to go to work, her purse was set so that she could go and get going and be ready to go." Yet, she left the door unlocked, which suggests that she did so because she was expecting someone to come inside.  He also questioned the lack of DNA evidence and urged the jury to find this fact corroborated defendant's account that defendant and B.C. engaged in consensual sexual contact.

¶ 147    In rebuttal, the State commenced its argument by stressing the consistency of the

evidence in this case, including how the physical evidence corroborated B.C.'s testimony. In addition, the State referred to B.C.'s testimony as "credible" and "truthful." These statements are not improper when viewed in context as the prosecutor was comparing B.C.'s testimony to defendant's testimony. The prosecutor stated, "On the other hand, you have the defendant's testimony. In a word, ridiculous. All you can glean from that pack of lies that he told you is that he smoked a lot of crack that night." The prosecutor went on to argue:

"When you're thinking about his testimony, ladies and gentlemen, remember, he is a convicted felon, and you are allowed to consider that when you judge his credibility. His story is that he went over there with his friend, Maria. Maria, [B.C.], and he sat on the couch in the living room and smoked crack. He sprinkled a little bit of his crack on [B.C.]'s cigarette. And then in payment for that, she allowed him to put his mouth on her breast. And he wants you to believe that Maria, the mutual friend, was gone when that happened and that [B.C.] was fine with a man she doesn't know, who's using crack cocaine, was alone with her in her apartment with her three-year-old son. Preposterous, ladies and gentlemen. It is ridiculous."

¶ 148   In support of his argument that the prosecutor's remarks demonstrated "extreme disdain" resulting in unfair prejudice against him, defendant relies on *People v. Davis*, 287 Ill. App. 3d 46, 57 (1997). In a one-sentence remark on this issue, the *Davis* court stated, "We also note that the prosecutor improperly showed extreme disdain for the defense by stating in closing argument, '[t]his is how worthless this piece of paper is,' and crumpling up a defense exhibit which the court had admitted into evidence." *Id.* The prosecutor here certainly did not act in such a disrespectful manner. Indeed, the prosecutor here was merely commenting on the evidence presented and the reasonable inferences drawn therefrom when comparing defendant's

testimony to B.C.'s. "If a defendant chooses to give an explanation for his incriminating situation, he should provide a reasonable story or be judged by its improbabilities." *People v. Hart*, 214 Ill. 2d 490, 520 (2005). When it is clear the testimony of a defendant and that of the witnesses cannot both be true, "[t]he prosecutor may ask a jury to compare the defendant's story with that of other witnesses to decide what actually happened." *People v. Washington*, 101 Ill. App. 3d 409, 413 (1981). We further observe that this line of argument was invited by defense counsel. Statements will not be held improper if they were provoked or invited by defense counsel's argument. *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000). Thus, we find these comments were proper.

¶ 149  Defendant also contends that the State improperly placed the weight of the authority of its office behind the credibility of B.C. However, this was not a situation where the prosecutor "clearly and repeatedly stated his [or her] personal feelings about the witnesses' credibility." *People v. Roach*, 213 Ill. App. 3d 119, 124 (1991). In making the remarks regarding B.C.'s credibility, the prosecutor never employed any "I" statements, such as "I didn't get the feeling when [a witness] was on the stand that he was a liar" or "I got this feeling in my stomach that I just—I can't buy anything [a witness] says when he tells me *** that he lied to [a detective] once before." *Id.* at 123. The prosecutor here made no personal assertions about B.C.'s credibility or defendant's credibility. Instead, the prosecutor's remarks reflect her position on the evidence and responded to defense counsel's argument that it was B.C. who was lying about what happened on September 26, 2013. See *Washington*, 101 Ill. App. 3d at 413.

¶ 150  Lastly, defendant argues that the prosecutor commanded the jury to "send a message" to defendant when she stated, at the conclusion of her rebuttal argument:

"You all get this. You all understand that you cannot commit a violent rape and then

come into court and hide behind a big fat lie. You all understand that. Obviously, [defendant] doesn't. Tell him, ladies and gentlemen. Tell him that he cannot get away with this. Sign the guilty verdict."

We are aware that courts have, in the past, both sanctioned and condemned prosecutors' exhortations to "send a message" that crime in general will not be tolerated. See *People v. Chavez*, 265 Ill. App. 3d 451 (1994); *People v. Batson*, 225 Ill. App. 3d 157, 168 (1992) (prosecutor could properly admonish the jury during closing argument to " 'send a message to the community' that violent crime will not be tolerated"); *People v. Fluker*, 318 Ill. App. 3d 193, 202-03 (2000) ("[T]he prosecutor [improperly] turned the jury's attention away from the issues in an effort to turn the case into a referendum on attitudes toward gangs").

¶ 151   The prosecutor's remark in this case does not reflect an "us versus them" mentality. See *cf., People v. Harris*, 129 Ill. 2d 123, 159 (1989) (finding the remark "[e]verybody hears about crime. Nobody does anything about it. You have a unique opportunity to actually do something about crime on your streets" to be improper). In context, the prosecutor here is urging the jury to weigh defendant's testimony against the evidence presented and find his testimony not to be credible. The prosecutor here is asking the jury to send a message to the defendant, not the community, which is not improper.

¶ 152   Reviewing the allegations of prosecutorial misconduct in the context of the entire arguments of both parties, the evidence at trial, and the corrective action taken by the court, we find no error. Accordingly, since there is no error, there can be no plain error. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 82.

¶ 153                                   CONCLUSION

¶ 154   For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 155   Affirmed.